Filed 12/9/13  In re J.T. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.T., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>A.T.,<br><br>    Defendant and Appellant. | G048594<br><br>(Super. Ct. No. DP021913)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Deborah C. Servino, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, and Karen L. Christensen, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

\*          \*          \*

J.T., who was born in September 1999, was taken into protective custody when his father, A.T. (Father), was arrested on charges he sexually abused J.T.'s half sister, D.U. J.T.'s mother, M.U. (Mother), successfully completed a case plan, and, following a hearing under Welfare and Institutions Code section 364[1] (further code references are to the Welfare and Institutions Code), the juvenile court terminated dependency proceedings. Pursuant to section 362.4, the court issued final custody orders, giving Mother full legal and physical custody of J.T. and denying Father visitation rights.

Father challenges the final custody order denying him any right of visitation with J.T.[2] We conclude the juvenile court did not err by denying Father visitation rights, and therefore affirm.

## BACKGROUND AND PROCEDURAL HISTORY

### I. The Juvenile Dependency Petition and Detention Order

In November 2011, Father was arrested for sexually abusing D.U., his stepdaughter. On the day Father was arrested, J.T. and D.U. were taken into protective custody based on allegations of sexual abuse.

The Orange County Social Services Agency (SSA) filed a juvenile dependency petition (the Petition) alleging one count each of failure to protect (§ 300,

---

[1] Welfare and Institutions Code section 364, subdivision (c) states in relevant part: "After hearing any evidence presented by the social worker, the parent, the guardian, or the child, the court shall determine whether continued supervision is necessary. The court shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn."

[2] The visitation order under section 362.4 is deemed to be a final judgment. (§ 302, subd. (d).)

2

subd. (b)) and sexual abuse (§ 300, subd. (d)).  The Petition alleged that Father had sexually abused D.U., who was born in March 1996, about seven to eight times a month since she was five years old.  The Petition alleged that in November 2010, D.U. disclosed the sexual abuse to Mother, but Mother failed to report the matter to law enforcement, did not confront Father, and thereafter allowed D.U. to have unsupervised contact with Father.  The Petition alleged that Father physically abused J.T. and, on one occasion, locked J.T. in his room and hit him with a belt as punishment for bad grades.  The Petition also alleged that Father and Mother engaged in domestic violence, in the form of verbal abuse, in the presence of J.T. and D.U.

The juvenile court ordered that both J.T. and D.U. be detained and that SSA provide reunification services.  Father was granted visitation with J.T. "per jail regulations" while Father was in custody, and a minimum of two-hour, twice-weekly, monitored visits once released from custody.

## II.  Social Worker Interviews and Jurisdictional Hearing

In December 2011, J.T. met with the assigned social worker.  J.T., who did not know the purpose of the meeting, said that living in his home was "good," except when Mother and Father became angry and disciplined him.  When asked what he liked least about his family, J.T. responded:  "Them (Referring to [M]other and [F]ather), like fighting.  I don't want them to get a divorce or separate."  J.T. had not seen anyone sexually abuse D.U.  He confirmed that Father struck him and D.U. with a belt, a sandal, or his hands, to punish them.  J.T. reported that Mother and Father argued, sometimes loudly, and, on one occasion a long time ago, Father tried to strike Mother.  D.U. stopped Father from hitting Mother, and the police arrived later.  According to J.T., Father drank alcohol every day, but only got drunk once.  When drinking, Father would get angry "for any little thing."

3

The social worker also met with D.U. She described living in the home as a "living hell!" D.U. stated that Father began sexually abusing her when she was about five years old. When asked how often Father abused her, D.U. answered: "It was continuous, he did it every time he had a chance, sometimes when we were alone or even when my mom was there, but she wasn't watching, he would grab my butt or squeeze my boob." Father engaged in sexual intercourse and digital penetration with D.U. and had once attempted sodomy. Father threatened D.U. by telling her he would "rape [her] real bad, something that [she] would never forget" if she told the police. D.U. eventually told Mother, who was protective of her for a few months, and then "it went back to the same way it was before." D.U. became desperate and "told the school." D.U. described Father as an "alcoholic" and stated he became "aggressive" when he drank too much.

At the jurisdictional hearing, the juvenile court found the allegations of the Petition to be true by a preponderance of the evidence and declared J.T. and D.U. to be dependent children of the juvenile court. The court approved SSA's case plan, granted reunification services for Mother, and denied them for Father. The frequency of J.T.'s visits with Father was changed to twice monthly while he remained in local custody. Visits remained monitored.

### III. J.T.'s Visits with Father

The status review report, dated July 10, 2012, reported that Mother's progress in completing the case plan was moderate as to D.U. and substantial as to J.T. D.U. was residing in a foster home, and J.T. was living in a group home.

J.T. visited Father on December 13, 2011. J.T. told the case manager the visit "went 'ok' and 'he didn't have anything to talk about [with] him.'" J.T. also visited Father on January 24, February 7 and 28, March 13, April 3, May 1, and June 22 and 23, 2012. As to the March 13 visit, the July 10, 2012 status review report stated: "[I]t is important to note that at this visit, [F]ather was noted as saying 'I love you' in Spanish

4

and J[.T.]'s response was 'Me too.'" J.T.'s court-appointed special advocate (CASA) also prepared a report stating that J.T. usually visits Father twice a month.

J.T. participated in weekly sexual abuse therapy. His therapist reported that J.T. did not know, and did not want to know, why the family was involved with SSA. J.T. talked about his visits with Father and "appear[ed] to be connected with [F]ather." The therapist encouraged J.T. to write Father a letter, but J.T. "was not interested in completing [the] task." A report, dated February 21, 2012 from the Olive Crest Tustin Family Center, stated that J.T. "displays minimal interest when visiting [F]ather at jail visiting for an approximate of 10-15 minutes when he has been allotted for an approximate 30 minutes visitation period. J[.T.] has stated that he has nothing to talk to [F]ather about."

J.T. expressed the desire to continue visits with Father. Mother told the social worker, however, that she did not want J.T. to continue visits with Father. According to Mother, Father would tell J.T. "he was the man of the house and he had to be just like him." Mother feared that Father would have a negative influence on J.T.

On July 10, 2012, based on the parties' stipulation, the juvenile court ordered continued reunification services for Mother. The court amended Father's visitation plan to allow twice-monthly, one-hour visits with J.T. and authorized SSA to facilitate three makeup visits.

### IV. Interim Review Reports on J.T.'s Visits with Father

In September 2012, J.T. was returned to Mother's care under a 60-day trial visit. In December 2012, SSA recommended that both J.T. and D.U. be placed in Mother's custody. J.T. continued attending individual therapy. An interim review report, dated November 5, 2012, stated: "At this time, the family appears to be responding well to the supportive services implemented. There have been no concerns noted during this

5

initial 60-Day Trial period. The family is demonstrating a healthy relationship. [M]other continues to demonstrate a willingness to comply and cooperate with [SSA]."

An interim review report, dated December 5, 2012 (the December 5 Report), stated: "[J.T.] continues to attend individual therapy. [He] reports enjoying therapy and wants to continue." J.T.'s therapist reported having no concerns or problems with J.T.

As for J.T.'s visits with Father, the December 5 Report stated: "J[.T.] continues to want to visit with [F]ather. However, [M]other requests that the visits be stopped as [M]other reports that [F]ather is emotionally manipulating [J.T.]. [M]other reported that [F]ather recently wrote [J.T.] letters and mailed them to the home. [F]ather wrote about not [faring] well while incarcerated. As previously reported to the court on November 5, 2012, [M]other reported that on one occasion when the child returned from a visit [F]ather requested that [J.T.] purchase him a pair of reading glasses. The undersigned asked [J.T.] if [F]ather asked him for a pair of reading glasses and [J.T.] stated, 'Yes.'"

The December 5 Report included a report from a visitation monitor on J.T.'s visit with Father on October 29, 2012. The visit took place at the Orange County Central Men's Jail. When the monitor picked up J.T. at his residence, he was dressed and groomed appropriately and "appeared to be in good spirits as he was talkative and cordial." Father also was "cordial and appropriate" but "appeared solemn and dismal in his demeanor." Father's eyes were "red and watery," Father did not smile, and his tone of voice was "low and soft." Father and J.T. conversed for about an hour. They talked about J.T.'s progress in school and new hair style, and Father's knee injury and upcoming dental work. Father remained cordial throughout and "appeared to be content as he did not reply [*sic*] any displeasure or concerns." On the way home, J.T. appeared "relaxed and content" and the monitor had no concerns.

6

At the 12-month review hearing on December 5, 2012, the juvenile court returned J.T. and D.U. to Mother's custody as the permanent placement plan. The court ordered that J.T. continue to have twice-monthly, monitored visits with Father while he was in custody.

## V. Status Review Reports and Father's Letters

In preparation for the section 364 review hearing in June 2013, SSA submitted a June 5, 2013 status review report (the June 5 Report) and a June 13, 2013 addendum report (the June 13 Report).

The June 5 Report stated J.T. had completed sexual abuse therapy in December 2012, and reported the following information from the therapist's termination report: "J[.T.] addressed visitation with [F]ather. He was very happy that he was able to resume visits because he did not get to see him last month. He said [M]other didn't want to take him. Discussed how it might be due to her wanting to punish [F]ather but it would be important for her to see it as supporting J[.T.]. He expressed his perception was because she believes [F]ather says 'bad things' to him. Inquired if this was accurate and he denied it. The therapist expressed that it made sense that she would want to prevent visits for this reason. [¶] Discussed with the Social [W]orker's concerns with J[.T.] and her desire for him and [M]other to participate in a conjoint therapy session to address concerns and conflicts about his visitations with [F]ather. [J.T.] expressed not wanting to do this."

According to the June 5 Report, J.T. and Mother did participate in conjoint therapy in February 2013. The therapist reported that J.T. was able to acknowledge what Father had done, and stated, "the family is trying to bond and move forward but it's difficult when [F]ather is being manipulative." The therapist recommended that Mother stop accepting mail from Father.

Attached to the June 5 Report were several letters Father had written and mailed to Mother and J.T. The letters were handwritten in Spanish. Copies of English language translations of the letters were provided to the juvenile court, and excerpts of the translations were included in the June 5 Report. In a letter dated February 4, 2013, Father wrote: "I never thought you'd stoop so law or prostitute yourself. . . . Don't be giving away your body you['re] not from the street. You['re] worth so much more and take care of your self from Aids [*sic*]. I know you don't want to see me and that's fine. Thank you for giving me a son."

In a letter dated February 13, 2013, Father wrote: "You are coming too to jail with me too. . . . Think about your papers maybe they won't come. They may never come it all depends on me. Just like you left jail the last time you'll come back alone. If I open my mouth they are going to bring you quickly. Only when I get desperate a little bit more. For my son I'm capable of anything. You know me . . . I've started to care less . . . wait two more years and you'll see you'll be eating here in jail. There are a lot of women here. If you want turn in these papers to the police. For me it would be the best. You'll quickly come here. . . . I'm not threatening you but the things I have written are truthful. . . . [Y]our children will know there someone outside who has them and who is looking out for them. Think about it, think and continue to think. I have telephone # in my wallet from Mexico and Pochotepec. I'm going to see if I can communicate with them if not my friend whose outside is going to do it with your family. Any how I'm looking for the directions to your work facilities. I'm going to send them your information of what happen[s] with your supervisors or should I say lovers or maybe they'll celebrate with you for what you did with them in bed. . . . Think about it before you do something you regret well I'll leave you." (Second & third ellipses in original.)

In a letter dated February 10, 2013, Father wrote: "Son, be brave have hope in Jesus. . . . [¶] . . . [¶] . . . [J.T.], I know you're doing badly at school. Son, you're not at fault what's happening. . . . You have to be strong and rise above this and other

things to come. . . . Son, don't get involved in gangs and don't hang out with negative company. . . . You're a big winner. . . . [I]f you need something call your godfather . . . . He's going to look for you three times and he has not found you at home."

In the June 5 Report, the assigned social worker stated that Father's letters "infer threats against [M]other, her family and employment," "demonstrate inappropriate communication with [J.T.]," and "demonstrate a continued pattern of elements of Domestic Violence which is a part of the family's social history." The social worker concluded: "It is a difficult decision not to support the child, J[.T.]'s, desire to visit [F]ather however; [a]t this point it is not in the best interest of the family as [Father]'s letters indicate safety threats, as he is exhibiting domestic violence tendencies."

In both the June 5 Report and the June 13 Report, SSA recommended termination of dependency proceedings with exit orders. The June 5 Report stated: "In order to continue to support and decrease risk for future sexual abuse the undersigned recommends that [Mother] be granted full physical custody and given total authorization over visitation rights. [M]other needs to maintain parental authority of the family in order to be protective of all her children."

J.T.'s CASA submitted a report on June 5, 2013. As for visits with Father, the CASA's report states, "J[.T.] has not seen him for several months and expresses no interest in pursuing the contact."

## VI. The Section 364 Hearing

A contested section 364 hearing was held on June 13 and 17, 2013. The juvenile court received in evidence the June 5 Report and the June 13 Report. The court also read and considered the CASA report filed on June 5, 2013.

At the hearing, J.T. testified he knew that Father was in jail because "he did something to my sister." J.T. had not visited Father since April 2013 and did not know why he had not visited since then. J.T. would have liked to have visited Father in May

and would like to visit him in June. When asked why he wanted to visited Father, J.T. answered, "[b]ecause I haven't seen him in a long time." J.T. testified that when visiting Father, they talk about grades in school. Father had told J.T. he needed to obey Mother and live with her until he was 18 years old. J.T. felt "bad" when he was unable to visit Father in May.

J.T. testified he loved Father. When asked if he enjoyed visiting Father in jail, J.T. answered, "[n]ot in jail but I do like visiting him." J.T. liked visiting Father because "I get to see him and that's something that I don't really get to do." J.T. wanted to continue seeing Father in the future and would feel "bad" if he could not do so.

On June 17, at the conclusion of the hearing, the juvenile court adopted SSA's recommendation in the June 5 Report and ordered termination of dependency proceedings with no visitation rights for Father. On the issue of visitation, the court stated: "I understand J[.T.]'s desires to visit with [F]ather. However, the statements in the letters read with everything in light, do indicate that this is dangerous and that this court has the responsibility of the Welfare [and] Institution[s] Code to [e]nsure that this visitation does not jeopardize the safety of the children when it applies to visitation orders. [¶] And the court has the obligation to J[.T.] and D[.U.] and, at this time, [F]ather made the poor decision to write these letters and to conduct himself the way he has. [¶] And at this point the court does not find appropriate to have any visitation between [F]ather and J[.T.]."

Father timely filed a notice of appeal from the June 17 order terminating dependency proceedings and denying him visitation rights.

## DISCUSSION

Upon termination of dependency proceedings, the juvenile court may issue "an order determining the custody of, or visitation with, the child." (§ 362.4.) Such

10

orders[3] are transferred to an existing family court file and remain in effect until modified or terminated by the superior court. (*In re Chantal S.* (1996) 13 Cal.4th 196, 203; *In re John W.*, *supra*, 41 Cal.App.4th at p. 970.) In making a custody or visitation order under section 362.4, the juvenile court must consider the best interests of the child. (*In re John W.*, *supra*, at p. 973.) "[T]he juvenile court has a special responsibility to the child as *parens patriae* and must look at the totality of the child's circumstances." (*In re Roger S.* (1992) 4 Cal.App.4th 25, 30-31.)

A custody or visitation order under section 362.4 is subject to the abuse of discretion standard of review. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) A reviewing court will not disturb a custody or visitation order under section 362.4 unless the juvenile court exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. (*Bridget A. v. Superior Court*, *supra*, at p. 300.)

Father argues the order denying him visitation rights lacked factual support and therefore constituted an abuse of discretion. He argues the evidence established that J.T. loved Father and wanted to continue visiting him, Father and J.T. had had a relationship since J.T.'s birth, Father had never been denied visitation rights at any time before the section 364 hearing, and there was no showing that J.T. would suffer detriment if permitted to visit Father.

The juvenile court heard J.T. testify and understood he wanted to continue to visit Father. The juvenile court considered the relationship between Father and J.T. and the positive aspects of their visits. But the juvenile court had to look at the totality of the circumstances, which included Father's letters to Mother and J.T. In those letters, Father accused Mother of being a prostitute, threatened to disclose information that would lead to her incarceration, threatened to contact her family in Mexico and her

[3] Orders under section 362.4 are sometimes called "'exit' orders." (*In re John W.* (1996) 41 Cal.App.4th 961, 970.)

employer, and threatened to impede her immigration progress. Although Father's letters to J.T. were generally positive, the social worker concluded the letters were threatening to Mother and demonstrated a continued pattern of domestic violence. The therapist stated, "the family is trying to bond and move forward but it's difficult when [F]ather is being manipulative." The juvenile court found the letters to be "dangerous."

Father's letters provide a factual basis for the juvenile court's decision to deny Father visitation rights. From the letters, the court could conclude, as did the therapist, that Father was trying to manipulate the family, and could conclude, as did the social worker, the letters were part of a continued pattern of domestic violence. Allowing visitation rights with J.T. would give Father additional opportunity to manipulate the family, impede the healing process, and interfere with Mother's parental authority and ability to protect her children. Contrary to Father's argument, the no-visitation order protected J.T. because he is part of the family that Father was trying to manipulate. The no-visitation order prevents Father from manipulating the family through visits with J.T.

Father argues that his letter writing was brought to the juvenile court's attention at the 12-month hearing in December 2012. The letters in issue were written in February 2013, after that hearing. Father argues the last letter was dated February 13, 2013—four months before the section 364 hearing—and, therefore, denial of visitation rights was unnecessary. He also argues that any concerns for Mother's safety could be addressed by issuing restraining orders against him. The timing of the letters and alternate means of protecting Mother were matters for the juvenile court to consider in exercising its discretion. The sole question before us is whether the juvenile court exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. Given the totality of the circumstances, the juvenile court did not abuse its discretion by denying Father visitation rights.

12

**DISPOSITION**

The order is affirmed.

FYBEL, J.

WE CONCUR:

O'LEARY, P. J.

RYLAARSDAM, J.

13