Filed 3/28/14  In re E.M. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re E.M., a Person Coming Under the Juvenile Court Law. | B250066 (Los Angeles County Super. Ct.  No. CK92399) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,        Plaintiff and Respondent,        v. H.M.,        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen Marpet, Juvenile Court Referee.  Affirmed.

Jesse F. Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

H.M. (mother), a California resident, appeals from an exit order granting R.M. (father), a New Jersey resident, sole legal and physical custody of E.M. and imposing strict conditions on mother's visitation.  Mother contends the dependency court abused its discretion when it (1)  entered a *Child Custody Abduction Prevention Order* without sufficient evidence of risk that mother would take E.M. without permission; (2)  ordered a maximum amount of in-person visitation without also identifying a minimum and granted father sole authority to approve visits outside of New Jersey; and (3)  required two monitors approved by father for any in-person visitation.  We conclude the court's order does not constitute an abuse of discretion, and therefore, we affirm.

## STATEMENT OF FACTS AND PROCEDURE[1]

Mother and father are the divorced parents of E.M., a ten-year-old girl.  Mother and father met in South Korea while father was working as an English teacher and were married in April 2003.  Mother had worked at Hewlett Packard, Exxon Mobil, and Logitech in South Korea.  In March 2004, shortly after E.M. was born, mother took a leave of absence from her job and brought E.M. to California to live with father, who had returned to the United States to find work.

Between 2004 and 2006, at least two reported incidents of domestic violence took place between E.M.'s parents, and mother learned that father had been hospitalized for schizophrenia at least twice while he was in the United States and she was still in Korea.  Mother looked for work, but because her education and work experience was in South Korea, she was unable to find a job.  Their divorce was finalized in 2008, and the family law court granted mother sole custody of E.M., with monitored visitation rights for father.  In March 2010, the family law court gave father joint legal custody and modified

---

[1]     Many of the facts discussed in the November 19, 2013 unpublished opinion in case No. B245227—mother's appeal from jurisdictional findings and dispositional orders— are also relevant to the current appeal.  We repeat the facts recited in that opinion as appropriate.

2

the visitation schedule to permit monitored visits on alternate weekends. Father has a history of schizophrenia but has been compliant with his medications and in good mental health for the past six years. He lives in New Jersey.

In December 2009, mother took E.M. to an urgent care facility when she was experiencing "flu-like symptoms." Mother discovered mold in her apartment a month later near the kitchen sink. She moved out of the apartment in January 2010 and claims she and E.M. have been suffering from mold exposure ever since. She has taken E.M. to multiple doctors, repeatedly faxing lists of medical tests that she wants the doctors to run on E.M. to explain symptoms such as frequent urination, dark and pungent diarrhea, black bruises appearing on hands only at night, and difficulty breathing. Doctors observed that E.M. had a flat affect and would usually repeat verbatim the symptoms described by mother.

Dr. Mona Shah was E.M.'s treating physician for over a year. In Dr. Shah's opinion, "[m]other believes that she has the exact same thing as [E.M.] Mother is paranoid or obsessive compulsive. She types out a manifest and a check list of lots of blood tests she wants done. She has been offered therapy at the clinic but she has not accepted. She believes she is dying f[rom] mold and something in her computer keyboard, and that she has cancer. We believe that mother needs a mental health evaluation. The child is a[t] risk because of mother's delusions. The child has no signs of mold exposure, [E.M. is] a healthy child. We can't keep poking and prodding this child because her mother believes she is sick."

Dr. Lidia Alonso saw E.M. several times and found nothing wrong. She described mother as "obsessive" and "relentless" in insisting that E.M. was ill and seeking multiple tests for E.M. Dr. Alonso and UCLA tried referring mother for mental health treatment, but she did not go.

Letters between mother and the insurance company list numerous physical complaints and criticizing the doctors' lack of response. According to a children's social worker (CSW), "mother's writings alone are extremely concerning. The mother appears relentless in her pursuit of labeling [E.M.] as ill, which will then result in unnecessary

3

medical tests and treatment, let alone emotional damage that stems from one being told repeatedly that they are not well and possibly very sick."

Dr. Paula Kuhlman wrote a letter to mother dated January 20, 2012, expressing concern that mother was suggesting symptoms to E.M. and subjecting her to unnecessary testing and doctor visits. Dr. Kuhlman notified the Department of Children and Family Services (Department) of her concerns for E.M.'s safety. The Department commenced an investigation.

On February 15, 2012, a CSW interviewed E.M. at school. E.M. reported feeling fine at school but having nausea and frequent urination at home. A school staff member reported that when she walked E.M. back to class after E.M. spoke with the CSW, E.M. said, "I always knew this day would come." Mother faxed a letter to the CSW several days later stating that E.M. "forgot to mention a few things" during the CSW's visit to the school. Mother said E.M. had "too many symptoms," which she forgot to include. Mother claimed E.M. had "Diarrhea, Stomach ache, Headache, Runny and Itchy Nose, Leaky gut feeling (her left side), Bruise on her hands, Pain in her heel, Frequent Urine and change in color of urine, Blurry Eyes, Coughing, Nausea, Vomiting (8 times), Itchy Skin, Skin Rash, Short Breath, Chest Pain."

On February 28, 2012, father reported to a CSW his feeling that mother overreacted to possible altitude sickness and carbon monoxide poisoning. He said, "the sad part about all of this is that Mother really believes that she and [E.M.] are ill." He reported that when mother is under a lot of stress, she dreams of these types of illnesses and then researches them. He is concerned because mother said she is going to have surgery to remove the mold from her body, and he feared that mother will find someone to do surgery on his daughter as well.

On February 29, 2012, the dependency court issued a warrant to remove E.M. from her home. Mother became very agitated when the Department sought to remove E.M., yelling that E.M. could not go and grabbing her to prevent her from leaving. Mother claimed she and E.M. were getting ready to leave for Korea. The Department needed assistance from law enforcement because mother was not cooperative. E.M. was

4

placed in a foster home. At the March 5, 2012 detention hearing, the court ordered monitored visitation for mother twice a week and reasonable monitored visitation for father.

During the course of the dependency proceeding, mother sent numerous e-mails to the Department, father, and paternal grandparents describing E.M.'s purported illnesses, criticizing E.M.'s medical care, and urging further medical treatment. After repeatedly complaining to CSWs about the "poor quality of air" in the Department's offices, mother sent 12 e-mails between May 26 and July 10, 2012, detailing her own and E.M.'s illnesses. A June 14, 2012 e-mail threatened: "Our further health damage from this point will become the whole responsibility of your office."

From April through August 2012, mother demonstrated a lack of insight into how her statements and actions were impacting E.M. Around April 30, 2012, the foster parents complained of harassing behavior by mother, and E.M.'s counsel requested that mother's monitored visits take place at the Department's offices only. During a May 10, 2012 visit, mother looked through a giant anatomy book with E.M. and told E.M. to shower every day because sweat would create a fungus on E.M.'s body if E.M. did not shower. The Department's May 22, 2012 report[2] states E.M. "is at very high risk of harm. Since the mother continues to believe her child is ill, it is likely the mother will continue to seek out unnecessary invasive medical examinations for her child as well as emotional damage that stems from one being told repeatedly that they are not well and possibly very sick." After a visit on June 12, 2012, mother told the CSW that E.M could come home. She explained that her mold case had settled, but that the money was being held until E.M. was returned to her care. She also stated that she and E.M. were about to go to Korea and she had nothing and no job. In August 2012, mother violated the dependency court's orders to not discuss health matters during visits with E.M several times, telling E.M. that she smelled and needed to shower, and brush her teeth more

---

[2]     The dependency court entered several reports into evidence on the first day of the jurisdiction hearing on September 20, 2012.

often. E.M. was increasingly uncomfortable during visits with mother and would go to the restroom to give herself a break from mother's presence. E.M. no longer wanted to visit mother and preferred to live with father in New Jersey instead.

On August 31, 2012, the Department requested the twice weekly visits be terminated based on mother's deteriorating behavior. The Department's request pointed out that "mother has demonstrated numerous volatile, inappropriate, and harmful behaviors during her visits with [E.M.] The child has been exposed to numerous bouts of rage, frustration, and anger exhibited by the mother warranting the Department's discretion to terminate visits early. In addition, the visits have recently become monitored by two [CSWs] due to mother's volatility." The dependency court ultimately suspended mother's visits with E.M. on September 4, 2012, pending the jurisdiction hearing.

In early September, the dependency court granted the Department's request to appoint Dr. Steve Ambrose, a psychologist, as an expert to evaluate mother and father and make recommendations for E.M.'s placement and parent's visitation rights at disposition. The court order directed Dr. Ambrose to opine on mother's ability to use services, her current psychological condition, and her ability to remain symptom free. Mother objected to the appointment and never returned Dr. Ambrose's calls to arrange an evaluation. Although Dr. Ambrose did not interview or evaluate mother, he did review the court records and interviewed the CSW on the case. Based on the information before him, Dr. Ambrose concluded there was a significant likelihood of emotional abuse if E.M. returned to mother. "Given [mother's] reported lack of involvement in treatment and her continued highly inappropriate behavior during monitored visits, there is little reason to believe that she could provide a safe and stable home environment for [E.M.] Based on the report of both [E.M.] and [the CSW], [mother] continues to display poor judgment, emotional volatility, and a severe lack of insight. [E.M.] clearly does not feel safe and comfortable with [mother] even when their visits are monitored." Dr. Ambrose's report recommended that E.M. be placed with her father in New Jersey, and

6

that visitation between E.M. and mother be discontinued until mother participates in treatment and demonstrates an improved ability to regulate her emotions and behavior.

On October 24, 2012, the dependency court sustained allegations under section 300, subdivisions (b) and (c). At a disposition hearing on October 30, 2012, the court ordered E.M. to remain removed from mother and placed with father in New Jersey. The court ordered visitation as follows: "The mother's visits are to take place at the [Department] office twice a year in Los Angeles. Appropriate security including 2 CSWs are to be monitoring the mother's visits. If the mother does visit the child in New Jersey she may see the child in a monitored setting twice during the week for 2 hours in duration. Two appropriate monitors are to be supervising the mother's visits in New Jersey as well. Whenever the mother visits the child and or speaks to [the child] by the phone she is not to discuss any health issues, or illness. The mother is not allowed to bring books or articles related to anatomy or medical issues. Furthermore, the mother is not allowed to take the child outside of the Los Angeles Area, New Jersey and or the United States whenever she is visiting. Also, the mother is not allowed to go to the child's school except for a school function. [Mother] is allowed to speak to the child by the phone twice a week for up to 15 minutes in duration."

On November 7, 2012, the dependency court clarified that the case plan filed with the court on October 30, 2012, was part of the court's orders, reiterating its earlier orders regarding visitation, its prohibition against mother obtaining a passport for E.M., and its orders regarding individual and psychiatric counseling for mother. The court ordered that mother was not permitted to obtain Korean or American passports for the child. Mother's visits were to take place once a month and once a week when she was in New Jersey. All monitors were to be approved by the Department and could not be health services aides (HSA). Mother was only allowed to attend E.M.'s school functions if she was invited. Mother was allowed telephone contact with E.M. twice a week for up to 15 minutes, only during daylight hours. The Department did not have discretion to liberalize mother's visits. The court also clarified that it was ordering mother to see a psychologist

7

who was not an intern and the psychologist was to address all case-related issues. The court also ordered mother to participate in psychiatric counseling.

By April 30, 2013, mother had not obtained psychological or psychiatric counseling as ordered by the dependency court, nor did she submit to an evaluation under Evidence Code section 730. When a CSW asked her about therapy on December 18, 2012, mother responded: "The court can't force anyone to go to therapy when the therapist says there are no symptoms" and produced a copy of a therapist's letter dated April 5, 2012, stating mother did not present any issues. Mother refused to meet with Dr. Ambrose because "he is paid by the government."

The Department had some difficulties arranging phone visitation. Mother claimed to work at Google seven days a week, stated she always worked late, and claimed she could only call E.M. during her lunch hour, which conflicted with E.M.'s after-school activities. Father's wife monitored phone calls and reported problems, including having to end at least one call early because mother repeatedly discussed case matters with E.M., even after being warned to stop. Mother would argue that 15 minutes had not passed and that people were forcing E.M. to say things. E.M. acknowledged that phone calls with mother made her uncomfortable and expressed a desire for fewer calls, "maybe once per week."

Mother did not visit E.M. in New Jersey, despite the court order permitting her to do so. Instead, mother e-mailed the Department to propose a two-day visit in Las Vegas on December 20 and 21, 2012, and a one week visit in California from December 20 to 27, 2012. When a CSW attempted to explain the parameters of the dependency court's order, mother responded stating: "In this case, I have no choice but suing a social worker who made the following request. I will not pay $1000 to see my child for 2 hours in your office." She later asked the Department to pay for her to flight to New Jersey, have her friend monitor the visit, and see E.M. from 9:00 a.m. to 5:00 p.m. on February 2 and 3, 2013.

In the same time frame, E.M. adjusted very well to living with her father and step-mother in New Jersey. In December 2012, she wrote her mother a letter stating she loved

it "and to be truthful, I am not intending on going back to live with you. No one is telling me to say that and I am not joking." E.M. was successfully attending therapy. Father completed a 12-week parenting program and continued ongoing counseling and psychiatric care.

On May 14, 2013, the dependency court terminated jurisdiction over the dependency matter and adopted an exit order giving father sole physical and legal custody of E.M. The order included a *Child Abduction Prevention Order*. It also granted mother one monitored phone call per week for 15 minutes on Saturdays and a maximum of one in-person visit per month for two hours, supervised by monitors previously approved by father. In-person visits were to take place in New Jersey, unless a different location was approved by father. Mother was to bear the costs of arranging her own transportation and the cost of two monitors, previously approved by father.

## DISCUSSION

When the juvenile court terminates jurisdiction, it has authority to make "exit orders" addressing custody and visitation. (§ 362.4; *In re T.H.* (2010) 190 Cal.App.4th 1119, 1122-1123.) Section 362.4 provides in pertinent part: "Any order issued pursuant to this section shall continue until modified or terminated by a subsequent order of the superior court. The order of the juvenile court shall be filed in the [family law] proceeding . . . at the time the juvenile court terminates its jurisdiction over the minor, and shall become a part thereof." The court's exit orders "become part of any family court proceeding concerning the same child and will remain in effect until they are terminated or modified by the family court." (*In re T.H.*, *supra*, at p. 1123.)

We review a dependency court's decision to terminate jurisdiction and issue custody and visitation orders under section 362.4 for abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) When a determination is "committed to the sound discretion of the juvenile court, . . . the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.] As

9

one court has stated, when a court has made a custody determination in a dependency proceeding, '"a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]."' [Citations.] And we have recently warned: 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) Where substantial evidence supports the order, there is no abuse of discretion. (*In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 839.) "It is not our function to weigh the credibility of the witnesses or resolve conflicts in the evidence. [Citation.] Rather we must indulge in all reasonable inferences to support the findings of the juvenile court and must review the record in the light most favorable to the juvenile court's orders." (*Ibid.*)

## Child Abduction Prevention Order

Mother contends the dependency court abused its discretion by entering a *Child Abduction Prevention Order* when there was insufficient evidence that any measures were needed to prevent mother from abducting E.M. Mother also contends the restriction preventing her from removing E.M. from the state of New Jersey and the United States of America is overly broad, excessive, and unwarranted. We disagree. The court's decision to include a *Child Abduction Prevention Order* and to restrict travel outside of New Jersey and the United States was neither arbitrary nor capricious, but rather was well grounded in the facts before the court.

In determining whether measures are needed to prevent abduction, the dependency court must consider "the risk of abduction of the child, obstacles to location, recovery, and return if the child is abducted, and potential harm to the child if he or she is abducted." (Fam. Code, § 3048, subd. (b)(1).) In determining risk, the court may consider a party's lack of strong ties to the state, or the existence of strong ties to another

10

state or country, including foreign citizenship (*id*., subd. (b)(1)(C) and (D)), "[w]hether a party has a history of a lack of parental cooperation or child abuse" (*id*., subd. (b)(1)(G)), and previous threats "to take, entice away, keep, withhold, or conceal a child in violation of the right of custody or of visitation of a person" (*id*., subd. (b)(1)(B)).

The dependency court found that mother posed a risk of abduction based on her lack of strong ties to the state, her strong ties to another country, and her history of non-cooperation. Mother is a South Korean citizen who was born and raised in South Korea. She moved to the United States to live with E.M.'s father, but she has since divorced, and there is no evidence she has any family in the United States other than E.M., who holds dual citizenship between the United States and Korea. Mother emphasizes that she did not take E.M. to Korea when she had both the authority and the opportunity to do so. But when the Department initially detained E.M. on March 1, 2012, mother refused to voluntarily release the child, stating they were getting ready to leave for Korea. The Department needed assistance from law enforcement to take E.M. into protective custody. In March 2012, the dependency court ordered mother to turn over E.M.'s passport and ordered mother not to seek any renewal of E.M.'s passport, so that there was no opportunity for mother to take E.M. and flee the country. On June 21, 2012, mother informed the Department that her mold case had settled, and she needed E.M. returned to her custody so she could obtain the settlement money, and that she and E.M. were about to go to Korea. She explained that she had sold her possessions, she had nothing and no job, and she could find better work in Korea. In January 2013, mother wrote to E.M. that she had moved their belongings into storage because mother planned on taking E.M. to Korea, "when the case is over as I won my appeal as you already know." Each of the foregoing facts supports an inference that mother has strong ties to Korea and a desire to take E.M. to Korea.

Mother has also demonstrated an unwillingness to cooperate in parenting, verbally attacking father and his wife during telephone calls with E.M, and accusing father and his wife of taking E.M. away and forcing E.M. to say things that are not true. Mother repeatedly refused or failed to follow court-ordered restrictions on her visits with E.M.

11

She brought medical texts to the visits and asked E.M. questions about her health even after the dependency court ordered her not to do so. Mother's inability to adhere to the court's restrictions ultimately led the court to suspend visitation until the jurisdictional hearing.

The dependency court must also consider the risk of potential harm in determining whether abduction prevention measures are needed. If mother were to abduct E.M., the potential harm is great. As recently as April 19, 2013, the Department found a "'VERY HIGH' risk of future abuse or neglect if the child was returned home to her mother . . . ." Mother refuses individual counseling and denies the need for any therapy and yet continues to discuss health concerns and case details in written and phone communications with E.M, in defiance of court orders and with no regard to the emotional trauma her actions cause E.M. Based on the foregoing facts, we conclude the dependency court's inclusion of a *Child Abduction Prevention Order* as part of its exit order was not an abuse of discretion.

## Restrictions on Visitation

When making exit orders determining custody and visitation, the dependency court is required to make an informed decision concerning the best interests of the child. (*In re John W.* (1996) 41 Cal.App.4th 961, 973.) "The power to determine the right and extent of visitation by a noncustodial parent in a dependency case resides with the court and may not be delegated to nonjudicial officials or private parties. [Citation] This rule of nondelegation applies to exit orders issued when dependency jurisdiction is terminated. [Citations.]" (*In re T.H., supra,* 190 Cal.App.4th at p. 1123) A visitation order may properly delegate responsibility for managing the details of visits, including their time, place and manner. (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374.) But it cannot delegate to a third party discretion to determine whether visitation will occur, as opposed to simply the management of the details. (*In re S.H.* (2003) 111 Cal.App.4th 310, 317-320 [improper delegation to child]; *In re Donnovan J.* (1997) 58 Cal.App.4th

1474, 1476-1478 [improper delegation to therapist].) In *In re Chantal S.* (1996) 13 Cal.4th 196, 213, the California Supreme Court upheld a lower court order specifying that a father's visitation was to be "facilitated" by the child's therapist and would only begin "when father's chosen therapist determined father had made 'satisfactory progress for a time.'" The court rejected father's argument that the order gave the therapists absolute authority to determine whether visitation should occur, noting that it would have been within the bounds of the lower court's discretion to deny visitation entirely. An order permitting visitation within very strict parameters, including a determination by father's therapist that father had made sufficient progress in his own therapy was also within the court's discretion and did not amount to an improper delegation of the court's discretion. (*Id.* at pp. 213-214.)

The relevant text of the dependency court's visitation order stated that mother was to have a "[m]aximum of one visit per month for two hours supervised[,]" "[t]here shall be no fewer than 2 monitors, previously approved by Father, present at all times during each and every visit[,]" and "[a]ny face-to-face visits shall take place in the state of New Jersey only, unless approved by Father. Under no circumstances shall Mother's visits exceed one, two-hour visit per month." Mother contends the dependency court abused its discretion by improperly delegating to father and E.M. power to determine whether mother may visit E.M. at all. Mother argues that by specifying a maximum number of visits, rather than a minimum, and by stating that *any* face-to-face visits are to take place in New Jersey unless approved by father, the court implicitly gave father authority to refuse visitation. Mother also contends the court abused its discretion by requiring two monitors who must be approved by father.

By setting a maximum limit on in-person visitation, the dependency court was correctly making an informed decision based on the best interests of the child, seeking to protect E.M. from the potential emotional distress of an extended face-to-face interaction. Mother's history of contentiousness about the scheduling and length of phone calls, together with her combativeness during the calls, had already led E.M. to request a decrease from two calls per week to once per week. The reporter's transcript reflects the

13

court's consideration of E.M.'s best interests, in light of mother's statements and actions during the dependency proceedings. Mother's counsel objected to the burden of permitting only one visit per month and requested the court to permit mother to see the child a couple of times a week if she was only in New Jersey for a week. The court responded: "It may seem onerous but the evidence before the court has been that this mother has – and in this latest report with all of the attachments in this report, and the statements mother has been making, the e-mails that mother has been doing, the conduct that's occurred is clearly dilatorius [*sic*] to this child and for that reason the court is making a limited order of visits for the mother with the child once a month." The court further explained the basis for its order, pointing out that mother "hasn't participated in any of the court orders which would assist her in reuniting with her child. She has taken no efforts to do any of that. So I think based on the evidence before me this – anything more than that would put this child at risk, that's what the order is going to be." The court's order setting a limit on in-person visitation does not imply that mother has no visitation rights. To the contrary, she continues to enjoy phone visitation with E.M. once a week and has the opportunity to see her child in person for two hours per month, provided she travels to New Jersey and identifies two monitors acceptable to father. We find these restrictions appropriate in light of mother's past behavior.

There is nothing in the record to support mother's contention that father will refuse to approve an in-person visit or a qualified monitor. (See, e.g., *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1010 [order for "reasonable" visitation with incarcerated parent was appropriate and must be read as preventing social services agency from arbitrarily determining that visitation between father and child during father's incarceration is "unreasonable."] There is no evidence that father ever objected to phone or in-person visitation. In requiring father's approval for visits outside of New Jersey, the dependency court properly delegated to father authority to determine the place of visitation, not whether a visit could take place at all. Mother's argument also ignores the fact that her own unreasonable demands have impeded her ability to visit E.M. Between November 2012 and May 2013, mother did not visit E.M. in New Jersey, despite a court

order permitting her to do so.  Instead, mother e-mailed the Department making proposals that ranged from a two-day visit in Las Vegas to a one week visit in California to two full days visiting with E.M. in New Jersey at the Department's expense.

We do not find the dependency court's limitations on mother's visits to be arbitrary or capricious in light of mother's repeated violations of court orders as well as her combative approach to visitation during the pendency of the case.

**DISPOSITION**

The order is affirmed.


KRIEGLER, J.


We concur:


TURNER, P. J.


MOSK, J.