41 Cal.App.4th 961 (1996)
48 Cal. Rptr.2d 899
In re JOHN W., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent,
v.
PHILIP W. et al., Defendants and Appellants.
Docket No. G016695.
Court of Appeals of California, Fourth District, Division Three.
January 8, 1996.
*964 COUNSEL
Michael D. Randall and Jane Winer, under appointments by the Court of Appeal, for Defendants and Appellants.
Terry C. Andrus, County Counsel, and Michelle Ben-Hur, Deputy County Counsel, for Plaintiff and Respondent.
Harold LaFlamme and Jess Ann Hite, under appointments by the Court of Appeal, for Minor.
OPINION
SILLS, P.J. 

INTRODUCTION
This is a bitter child custody case which became a juvenile dependency case on the strength of unproved allegations of child molestation. After more than a year in the juvenile dependency system, during which there was no finding of abuse, the juvenile court terminated its jurisdiction over the small child, John W., but split physical custody between both parents, requiring John to be shuttled every two weeks between northern Los Angeles County and southern Orange County. The father, Philip, the parent aggrieved by the false allegations of abuse, now appeals from that order, contending that in light of all the circumstances  particularly evidence that the mother, Michelle, coached and bribed her child into making the allegations  the juvenile court should have awarded physical custody to him. Like the child molestation allegations against the father, the allegations of coaching and bribery against the mother were never found true. Michelle also joins Philip in challenging an order precluding either party from attempting to modify its custody order in the family court until about a year had gone by.
We reverse and remand. First, the juvenile court's order precluding modification of this custody order was error. It was an unwarranted extension of *965 juvenile court jurisdiction into the future where no basis for juvenile court jurisdiction existed. Second, the custody order itself was also error. The juvenile court judge based his decision on the false assumption that he had to split physical custody because there was no evidence one parent was any better or worse than the other. In making "exit" orders, however, it is the best interests of the child, in the context of the peculiar facts of the case before the court, which are paramount. The court is not required to apply a per se rule that the child's time must be split in half as long as neither parent poses an active threat. Because the juvenile court applied such a per se rule here, there was prejudicial error and the case must be remanded.
But we do not remand to the juvenile court. We remand to the family court where this case should have been all along. Child custody disputes between divorced parents, neither of whom pose a risk of real detriment to the child, should not be waged at taxpayers' expense in the juvenile courts.

FACTS
Philip and Michele were married in October 1987. John was born in December 1989 and for awhile the couple employed a nanny to help with the child care.
Philip and Michele separated in October 1991. The first child abuse allegations were made in July 1992, when John was about two and one-half years old. John was detained and examined medically. There were no physical findings, though the infant made some statements which suggested he had been sexually molested.[1] A dependency petition was filed, but dismissed in September with the child being released to Michelle, with Philip agreeing to monitored visitation. Child molestation allegations were made again in mid-November 1992. John was again examined, and nothing was substantiated.
Beginning in July 1992, Philip began counseling with psychologist Gary Ruelas, while John began to be seen by psychologist Carol Knudsen. In February Knudsen and a social worker made the decision that John would not be at risk if the visitation was unmonitored. Michelle became "distraught" with the decision, and exclaimed that no one was protecting her son. Another child molestation report followed on March 22. Again, the allegations were not substantiated.
The next set of allegations reached the child abuse registry on May 21, 1993. John was again taken into protective custody. Because some physical *966 evidence (in the form of anal lesions) was present, social workers requested a "730 Evaluation," that is, an expert report.[2] Peter Chambers was appointed.
Dr. Chambers concluded that no child abuse occurred. He blamed the mother for inducing the child to make statements indicating abuse. Chambers wrote, "[t]he allegations are a result of a subtle Parental Alienation Syndrome directed, at an unconscious level, by the minor's mother...." However, Dr. Chambers also concluded that Michelle was sincere in her belief that the allegations occurred. He recommended that John be placed with his father, because the father was the "best suited to provide uninterrupted contact" with the other parent.
The petition was sustained, but not on child molestation allegations. Rather, the parties stipulated that juvenile court jurisdiction should be based on "serious emotional damage" under subdivision (c) of Welfare and Institutions Code section 300. The petition declared there was a risk of such damage to John because the parents' "ongoing custody disputes [had] created a tense, hostile and unpredictable environment." The juvenile court accepted the stipulation.[3] The court then followed Chambers's recommendation and released John to the physical custody of his father, Philip, with Michelle receiving visitation.[4] By this time Philip had moved to Northridge in northern Los Angeles County to take a job with a bank. Michele was living in Alisio Viejo in southern Orange County.
The six-month review was scheduled for January 19, 1994 (when John was just a little more than four years old), but was continued to March 18, 1994. The next child molestation allegation, for being "inappropriately touched in the genital area" by the father, was on January 31, 1994, just before Philip and John were to leave on vacation. When contacted by social workers, Philip's attorney said that the allegation was a form of harassment by Michele designed to prevent Philip from leaving on the vacation. Social workers eventually contacted Philip while vacationing in Utah. Philip agreed to meet with a social worker immediately upon his return on February 9, 1994. The allegation was declared "unsubstantiated" in the social workers' report for the March 18 hearing.
*967 Subsequently, Dr. Knudsen, who by this time was seeing John only once a month, filed a child abuse report of her own  against Michelle. As Dr. Knudsen later testified, John told her that his mother was "making me lie." Further, "she said that daddy plays with my pee pee, but that's not true. I lie when mommy makes me lie." Social workers later wrote for the six-month review that this claim was also "unsubstantiated."
The six-month review was continued again to April 22, 1994. At the review the court changed the visitation schedule for the upcoming summer (alternating three weeks with each parent) and ordered "conjoint therapy" at least twice per week between the mother and father  to be paid for by the taxpayers through the county treasurer.[5]
As the next six-month review approached, John was doing well in both homes and wanted to live with both parents. The summer had seen a "shift." Both parents were now "practicing more respectful interactions with each other." Philip was now "much more open and sharing." Files asked the parties to brainstorm "all possible custody and visitation schedules" to come up with their own plan. This, she hoped, would "empower them both." Still, Files advocated continued counseling so Philip could become "more comfortable in expressing his feelings and Michele can be responsive to him in a healthy way."
At the six-month hearing conducted September 9, 1994, a social worker testified that John was doing well alternating between households. Accordingly the social worker was of the opinion that both parents should have physical custody. Further, the social worker stated he had no evidence that Philip had molested John, or that Michelle had coached the minor into making false accusations. Then again, the social worker admitted it would be disruptive to John to "bounce back and forth between two schools," though there had been no problems getting the child back and forth between the parents during the summer.
For his part, Philip admitted that his son enjoyed being with Michelle and wanted to spend time with her. For her part, Michelle held steadfast to her *968 position that she was willing to abide by court orders allowing John to spend time with Philip despite her continuing belief that Philip really had committed child molestation.
At the conclusion of the hearing counsel for the social services agency, Philip and John each contended dependency court jurisdiction should be terminated. Counsel for Michelle (echoing her client's own ambivalence on the point)[6] simply consigned the matter to the court.
As to custody, there was more disagreement. Counsel for the social services agency argued in favor of a 50/50 plan, essentially because there was no reason to prefer one parent to the other. Counsel for Michelle argued that primary custody should be given her client; counsel for Philip and John each contended that Philip should be given primary physical custody.
The juvenile court judge prefaced his decision by noting that the lawyers had maneuvered the case so that there had never been a ruling on whether Philip committed child molestation, or Michelle had coached her son into making false accusations of child molestation. "We never put to bed, we never put to rest whether or not it really happened, and what this is  is a case that was negotiated through counsel that the child was suffering from serious emotional damage and that the parents can't take care of him." He then ordered juvenile dependency jurisdiction terminated, because the uncontradicted evidence was that John was no longer suffering emotional damage.
As to visitation, the court went with the 50/50 plan advocated by the social services agency, and granted both joint legal and physical custody to both parents despite the lengthy distance between Philip's home in the northern part of Los Angeles County and Michelle's in the southern part of Orange County. Essentially, the parents would have two weeks alternating custody. The juvenile court reasoned that because no one had given him any evidence that one parent was better or worse than the other, it could not make a decision as to who should have primary physical custody.[7] Because *969 both parents seemed equally loving, joint physical custody was "the appropriate decision." The court then directed that its orders should be filed with the family law court,[8] and added that its orders should not be modified before the fall of 1995. The consequent minute order stated that the "court's order re two week visitation is not to be modified prior to July 1995."
Both Michelle and Philip, represented by appointed counsel, have appealed from the order. Michelle simply claims the juvenile court could not make the order preventing modification before fall 1995. Philip makes the same claim, and further asserts that the "total picture" of the evidence required the juvenile court grant him primary physical custody.
(1) The order precluding modification has now expired. Nevertheless, there are three reasons we do not dismiss the appeal as moot. (Cf. In re Michelle M. (1992) 8 Cal. App.4th 326 [10 Cal. Rptr.2d 64] [dismissing as moot appeal from jurisdictional and dispositional orders where, about a year and one-half later, the juvenile court terminated its jurisdiction].) First, the problem of nonmodifiable exit orders is clearly one capable of repetition yet evading review. (Cf. id. at p. 330 [strongly urging Legislature to "consider alternative procedures for appellate review of dependency appeals" in context where jurisdictional issues are "made moot by the passage of time currently inherent in the appellate process"].) Second, there is obviously an ongoing controversy concerning custody and visitation that is very much alive. Third, in direct contrast to Michelle M., where there was no issue of public interest which needed to be addressed (see id. at p. 329), the question of which court (family law or juvenile dependency) to which this case should be remanded directly implicates the strong public interest in preventing the juvenile dependency system from being used to subsidize private child custody disputes.
Philip also argues that certain statements made by Michelle at an in camera hearing concerning the effectiveness of the representation afforded her by her appointed counsel[9] violated his right to due process.[10] Because we *970 return the case for reconsideration in a different court, we do not address the latter issue.[11]

JUVENILE COURT EXIT ORDERS ARE NOT THE EQUIVALENT OF FAMILY LAW PERMANENT CUSTODY ORDERS
(2) The first issue raised by the parties (whether the juvenile court could preclude modification of its order for a period of time after the termination of juvenile court jurisdiction) forces us to confront the nature of custody and visitation orders as authorized by Welfare and Institutions Code section 362.4.[12] The statute requires such "exit" orders to become a part of the relevant family law file.[13] It also provides that custody and visitation orders remain in effect in the family law action "until modified or terminated by a subsequent order."[14]
*971 The statute is silent, however, as to whether custody and visitation orders under it are the equivalent of permanent orders made in a family law case, such that the rule articulated in In re Marriage of Carney (1979) 24 Cal.3d 725, 730 [157 Cal. Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028], requiring a "persuasive showing of changed circumstances affecting the child," must apply.
The leading case on exit orders is In re Jennifer R. (1993) 14 Cal. App.4th 704 [17 Cal. Rptr.2d 759], which discussed them in some detail. Jennifer R. arose out of a neglect case where a child was removed from the most squalid conditions. (See id. at pp. 706-707.) The mother, as they say, never got her act together; she remained a drug addict, schizophrenic and depressed  and on top of that became homeless and suicidal. (See id. at pp. 708-709.) By contrast, the father began to turn his life around. He attended various 12-step groups, parenting classes and worked very hard on his reunification plan. (Id. at p. 709.) The child was placed with the father, and was doing well. At a review hearing, the juvenile court terminated its jurisdiction and made a section 362.4 exit order awarding the father sole legal as well as sole physical custody. (14 Cal. App.4th at p. 710.) The mother appealed, relying on the presumption in family law that at least joint legal custody is in the best interests of a child.[15]
The court perceived the mother's position to be that "... since family law would apply in the future it must govern juvenile custody orders entered upon termination." (14 Cal. App.4th at p. 711.) A corollary was that the exit order would prejudice the mother "in future family court proceedings" because there would "be a presumption in favor of maintaining the status quo." (Ibid.)
Jennifer R. rejected the mother's position, pointing out three things: (1) juvenile dependency proceedings are of a specialized nature; (2) case law holds that Civil Code and Code of Civil Procedure requirements do not apply in juvenile dependency law unless otherwise specified; and (3) nothing in the juvenile law itself says that Family Law Act provisions apply to custody determinations within dependency proceedings. (14 Cal. App.4th at p. 711.)
The court then elaborated on the basic differences between juvenile dependency and family law in custody matters. Each context presents the court with different roles  between determining the best interests of the child  and determining the best interests of the child as between two parents. (See 14 Cal. App.4th at p. 712, citing In re Roger S. (1992) 4 *972 Cal. App.4th 25, 30-31 [5 Cal. Rptr.2d 208].) Moreover, the presumption of parental fitness "that underlies custody law in the family court just does not apply to dependency cases." (In re Jennifer R., supra, 14 Cal. App.4th at p. 712.) The juvenile court makes its custody determination "without any preferences or presumptions." (Ibid., italics added.)
The Jennifer R. court next confronted the mother's notion that the termination of juvenile court jurisdiction necessarily "restored" previous presumptions of parental fitness. (14 Cal. App.4th at p. 713.) The idea was unsound given the structural differences in the respective systems. In particular, "The court's determination there was no protective issues was premised upon the existence of its custody and visitation order." (Ibid., italics added.) Hence the appellate court could not rule out the possibility of danger to the child "if [the mother] had unsupervised visitation rights or joint legal or physical custody." (Ibid.)
The Jennifer R. court concluded by reciting the substantial evidence in the record justifying the juvenile court's exit order. But at the very end of the opinion, in the style of a novel in which the most important event happens in the last paragraph, the court returned to the issue of the future modification of the exit order. "Should circumstances change in the future," the court said, the mother was "free to seek joint legal custody in the family law court." (14 Cal. App.4th at pp. 713-714.)
Jennifer R. dovetails perfectly with the prior case law which has also emphasized the difference in function between juvenile dependency and family law courts in the context of custody and visitation. In In re Benjamin D. (1991) 227 Cal. App.3d 1464, 1469 [278 Cal. Rptr. 468], this court wrote that "[t]he purposes and parties of family and juvenile proceedings, while often overlapping, are not the same ..." (fn. omitted), and held accordingly that a juvenile court was perfectly within its power in considering evidence that had already been presented in a family law hearing.
Likewise, in In re Roger S., supra, 4 Cal. App.4th at pages 30-31, this court again distinguished between the two forums, in part based on the "special responsibility to the child" assumed by the juvenile court "as parens patriae." There we held that the juvenile court erred in refusing to consider evidence which would have supported a more liberal visitation order for a father, because the court's power under section 362.4 required it to make an informed decision concerning the best interests of the child. (See 4 Cal. App.4th at p. 31; see also In re Hirenia C. (1993) 18 Cal. App.4th 504, 520 [22 Cal. Rptr.2d 443] ["... it would likely be reversible error for the juvenile court to refuse to hear evidence which is relevant to the formulation of an appropriate `exit' order regarding visitation"].) We further recognized *973 that the power accorded the juvenile court under section 362.4 necessarily made the juvenile court the "`appropriate place'" to determine custody and restraining orders. (In re Roger S., supra, 4 Cal. App.4th at p. 31, quoting Seiser, Custody and Restraining Orders in the Juvenile Court (Aug. 1990) Family Law NewsAlert (Cal.Ed.) 4, 8.)
One of the ideas that emerges from Jennifer R., as well as Roger S. and Benjamin D., is that section 362.4 exit orders cannot be equated with permanent family law custody and visitation orders. Juvenile court exit orders  and one must remember that section 362.4 presupposes an ongoing family law case[16]  are in the nature of pendente lite orders in family law. (See In re Michelle M., supra, 8 Cal. App.4th 326, 328 [dictum that parties may seek modification of exit orders in family court based on best interests of the child].)
In light of the lesser standard applicable to an exit order, it was error for the juvenile court to attempt to preclude modification of custody for the (roughly) 11 months following its decision. The preclusion order cannot be justified, as counsel for the social services agency has urged us, merely as a loose restatement of the Carney standard  a sort of friendly admonition to the parties not to bother the family law courts unless they had something really, really important.
We would add that the juvenile court's preclusion order was fundamentally inconsistent with the termination of jurisdiction. By precluding modification for over 11 months, the juvenile court was treading into jurisdictional territory properly reserved for the family law courts. The order precluding modification was, in essence, an extension of juvenile court jurisdiction into the future when all basis for its jurisdiction had been terminated.

IN MAKING EXIT ORDERS JUVENILE COURTS MUST LOOK TO THE BEST INTERESTS OF THE CHILD UNDER ALL THE CIRCUMSTANCES; THE JUVENILE COURT THEREFORE ERRED IN ASSUMING IT HAD NO CHOICE BUT TO SPLIT PHYSICAL CUSTODY
(3) Another idea that emerges from Jennifer R. is that in making exit orders, the juvenile court must look at the best interests of the child. Additionally, in Roger S., this court stressed the need for the juvenile court to make an informed decision in any exit order.
In Jennifer R., however, unlike the instant case, one of the parents constituted an active threat to the child, and termination of jurisdiction, as *974 the court specifically noted, was premised on that parent's not having custody of the child, not even legal custody. The case before us is different.
Despite the juvenile court's remark here that the child abuse allegations against both parents were never put to rest, as a practical matter they were. We presume that juvenile court hearing officers have more common sense than to release small children to the custody of individuals who have molested them, or, alternatively, have bribed children into making false accusations of molestation. Even though there never was a formal exoneration of either parent (much the same way that criminal cases rarely end with a jury declaring a defendant's absolute innocence), the fact remains the juvenile court was willing to return John to his parents. Unlike Jennifer R., here neither parent was adjudged to pose any danger to the child.[17]
But just because custody with neither parent was held to pose any danger to the child does not mean that both parents are equally entitled to half custody. A child's best interests are not necessarily served by shuttling between two parents, particularly during the school year and particularly when the parents live in different counties.
We do not know what would have been the outcome if the court had employed a strict best interest standard, but there are substantial grounds to believe the outcome might have been different. John's father lived north of Los Angeles; his mother south of Santa Ana. Any such arrangement would be totally unworkable during a school year, and even in the best of circumstances forcing a child to oscillate between two households requires a great deal of extra time and energy from both parents and the child.[18] We cannot say that the result would be the same had the juvenile court used the correct standard. The error being prejudicial, reversal is required.

THE CASE MUST BE REMANDED TO THE FAMILY COURT, NOT THE JUVENILE COURT
(4) We have already indicated that the juvenile court overstepped its authority by, in effect, extending its jurisdiction beyond the formal termination of its jurisdiction. There is no suggestion by any of the parties that termination of jurisdiction was not justified, and more than a year has passed since the juvenile court's order was made.
At the same time, we are faced with an exit order based on reversible and prejudicial error. Remand is clearly required. But are we to remand to the *975 juvenile court, which has, as the current expression goes, been "out of the loop" for more than a year now? At oral argument, counsel for both Philip and Michelle urged us not to return the case to the juvenile court, but to the family court. We agree.
Given the termination of the court's jurisdiction, remand to the juvenile court would be totally inappropriate. (In re Sarah M. (1991) 233 Cal. App.3d 1486, 1504 [285 Cal. Rptr. 374] ["The moment the juvenile court terminates the dependency proceedings, the child passes completely from the mandatory jurisdiction of the juvenile court, and the jurisdiction of the superior court, including the family law court, is available."].) Substantial time has passed, and the preclusion against modification is, as we have seen, error. To send the case back to the juvenile court would have the practical effect of derailing any attempt of the parties to resolve their child custody dispute in the proper forum  the family law courts  by giving the juvenile court the task of making a child custody order when the juvenile court has absolutely no jurisdiction over the child and the family court should be making it. On top of that, any reconsidered order to come out of that court would not have the force of a permanent family order.
The juvenile courts must not become a battleground by which family law war is waged by other means. It is common knowledge that the resources of local government social service agencies are stretched thin; in the juvenile dependency context those resources are manifestly intended to be directed at neglected and genuinely abused children.
Moreover, the misuse of the juvenile dependency system to litigate custody battles is not only unfair to taxpayers, but to litigants as well. As Justice Brauer pointed out in a perceptive concurring opinion in In re Anne P. (1988) 199 Cal. App.3d 183, 201-202 [244 Cal. Rptr. 490], a litigant may be unfairly prejudiced in a custody fight when the battlefield is shifted to the juvenile courts. At that point he or she faces not only an embittered ex-spouse, but a government adversary paid at public expense.
Of course, there still may be cases where, as happened in Anne P., the "`pure out and out hatred'" that divorcing spouses sometimes display toward each other  with the child seen more as trophy than human being  juvenile court jurisdiction based on the ensuing severe emotional distress will be necessary. (See In re Anne P., supra, 199 Cal. App.3d at pp. 198-201.) But such cases should be extremely rare.[19] Juvenile courts must be vigilant to prevent unsubstantiated allegations of monstrous behavior (which Anne P. *976 and the instant case have in common) from becoming a means of leverage in a custody fight, or a ticket to free legal services and psychotherapy.[20]
If indeed there is ever a place for it, the place for a custody battle is in the family law courts.[21] There the battle will not consume public resources which are better directed to children who typically do not have the luxury of two functional parents fighting for custody, and where the taxpayers do not have to pick up the tab for lawyers and psychologists.[22] In the present case, a couple who were doing well enough to employ a nanny while they were married have managed to have their respective custody appeals paid at public expense, as well as having had the benefit of numerous hours of taxpayer-subsidized psychological counseling.[23]
While remand to a court different from the one which issued the judgment appealed from is, to say the least, unusual, such a result is necessarily inherent in section 362.4, which expressly contemplates future proceedings in the family courts. By providing that the exit order be filed in any *977 dissolution case between the parents, the Legislature has demonstrated an intent that any future court proceedings in which custody is in issue be in the family court. When the merits of a section 362.4 exit order are at issue (as distinct from the validity of termination itself), the time lag inherent in the appellate process itself means that any remand must necessarily be directly to the family court. Who else is there when juvenile court jurisdiction has been correctly terminated?
We hope in future that juvenile courts will be discerning when they are presented with stipulated petitions based on "serious emotional damage" under subdivision (c) of section 300. In this case jurisdiction was predicated on a "tense" atmosphere caused by a parental divorce. That was hardly enough.[24] (See In re Sarah M., supra, 233 Cal. App.3d at pp. 1498-1499 [mere "family strife" not basis for continued juvenile court supervision where child did not exhibit "tremendous unmet needs" or "pathological fear"].) If the taxpayers have to foot the bill for lawyers, social workers and psychotherapists every time there is a "tense" psychological "environment" where a child is involved in a divorce case, there will be no money left for anything else.[25] On remand, we do not expect the taxpayers to be charged for the parties' legal representation.

CONCLUSION
The order of the juvenile court is reversed, and the cause remanded to the family court for a hearing on the custody and visitation issue. There the parties can litigate or settle the matter as between themselves.
Sonenshine, J., and Rylaarsdam, J., concurred.
On January 31, 1996, the opinion was modified to read as printed above.
NOTES
[1] As alleged in the petition that was filed thereafter, "On May 26, 1993, during a Child Abuse Service Team (CAST) interview, the minor disclosed that his father put a sword in his `poo poo.' (minor's term for rectum)."
[2] Section 730 of the Evidence Code provides that a court may appoint an expert to render a report as to matter about which expert testimony is required.
[3] We have the luxury of hindsight, including knowledge of later developments in the case which indicate the child molestation allegations were baseless. We recognize that the juvenile court did not have this advantage at the time. Nevertheless, the omission of the abuse allegations with the only remaining allegations being those of emotional distress based on a "tense" atmosphere brought on by an "ongoing" custody battle should have alerted the juvenile court that something was amiss.
[4] Philip's girlfriend Heather was living in the house at this time, and provided some help with the child rearing. For example, Heather was the one to give John his baths.
[5] The conjoint therapy was conducted by Barbara Files, an MFCC (marriage, family, and child counselor). Judging by her initial report dated July 14, 1994, Philip did not make a positive impression. Philip's own counselor, Dr. Ruelas, had earlier told social workers of Philip's being "open about his sexual background," to "exploring these issues therapeutically," and to being "willing to look at all issues openly." By contrast the person described in Files's initial report was a walking compendium of pop psychology cliches. The report described Philip as "extremely resistant to the therapeutic process," working hard to stay away from his "feelings," being "defensive and rigid," and suffering "very fragile" self-esteem. Michelle, on the other hand, was described as "very cooperative," "willing to look at the issues, talk about her feelings, and try options to make her life work better." Despite the disparity in impressions made by the two parents, however, Files's report did not make much of an impression on the juvenile court judge, who would later declare that there was no evidence that one parent was any better or worse than the other.
[6] Michelle testified that she understood that "everybody in this courtroom is a little tired of this case" but then stated she "really [didn't] want to terminate [jurisdiction over] the case" because she wanted to see "more progress done with Barbara Files, with Philip and I in her office." In terminating jurisdiction, the juvenile court impliedly declined this request for yet additional tax-supported family therapy.
[7] The court said: "Nobody has given me any evidence that one parent is better or worse than the other parent. Because I don't have that I can't make a decision as to who would be better to have physical custody or deserves primary custody versus the other."
[8] The direction accorded with section 362.4 of the Welfare and Institutions Code, which provides that when a juvenile dependency court terminates jurisdiction when a family law case remains between the minor's parents, the juvenile court's order "shall be filed" in the family proceeding.
[9] In criminal law, such proceedings are often called "Marsden hearings" after People v. Marsden (1970) 2 Cal.3d 118 [84 Cal. Rptr. 156, 465 P.2d 44].
[10] A copy of the transcript of the hearing was inadvertently included as part of the regular reporter's transcript (in violation of rule 33.5 of the Cal. Rules of Court) allowing Philip access to it.
[11] We do note, however, that in the family court to which we return the case no Marsden issue will be possible because counsel will be paid by the parties themselves, not by the public fisc.
[12] In pertinent part, the first paragraph of Welfare and Institutions Code section 362.4 reads: "When the juvenile court terminates its jurisdiction over a minor ... and proceedings for dissolution of marriage ... of the minor's parents ... are pending in the superior court ... the juvenile court ... may issue ... an order determining the custody of, or visitation with, the child."

Unless otherwise indicated all statutory references are to the Welfare and Institutions Code.
[13] In pertinent part, the second paragraph of section 362.4 reads: "[T]he order of the juvenile court shall be filed in the proceeding for ... dissolution ... at the time the juvenile court terminates its jurisdiction over the minor, and shall become a part thereof."

And if there are no family law or paternity proceedings pending, the third paragraph of the statute provides that the juvenile court's order "may be used as the sole basis for opening a file in the superior court of the county in which the parent, who has been given custody, resides."
We recognize that the term "exit order" is not used in the juvenile dependency statutes. Such orders are probably most accurately described as "section 362.4 orders" or "termination and custody orders." Unfortunately, the former gives the uninitiated reader no clue as to the nature of the order, while the latter is cumbersome. Calling them just "juvenile court custody orders" is unsatisfactory because that term is ambiguous. Juvenile courts regularly make custody decisions as between parents in the context of ongoing juvenile dependency cases where jurisdiction is retained (see § 361.2, subd. (a)), or as in the present case, in the context of a case which is leaving the juvenile dependency system. "Juvenile court custody order" does not tell the reader which is which. While not perfect, the phrase "exit order" has at least some currency in the case law (e.g., In re Katherine M. (1994) 27 Cal. App.4th 91, 97 [33 Cal. Rptr.2d 298]) as well as indicating to the reader that it involves the termination of dependency jurisdiction. We must, of course, add that it would be incorrect to assume from the phrase "exit order" either that juvenile courts (1) must terminate jurisdiction to enter a "custody order" (not so, see § 361.2) or (2) have no power to make a "custody order" when they do terminate jurisdiction (not so, see § 362.4).
[14] The first sentence of the second paragraph reads: "Any order issued pursuant to this section shall continue until modified or terminated by a subsequent order of the superior court."
[15] At the time of Jennifer R. the presumption was in section 4600.5, subdivision (a) of the Civil Code. Now it is in section 3080 of the Family Code.
[16] And, significantly enough, if there is not an ongoing family law case, the statute provides that the exit order, by itself, may be used as the basis for creating one. (See fn. 13, ante.)
[17] In supplemental briefing, counsel for the minor draws our attention to the fact that the child has admitted in conjoint therapy that he "made up stories about his father," having learned from the mother's reaction what sort of stories would "get her attention."
[18] Counsel for the minor argues in a letter brief that in the period during which this appeal has been pending the arrangement has been less than satisfactory. While we do not base our decision that the error was reversible on this alleged fact, it is a confirmation of what common sense would suggest anyway.
[19] In Anne P., for example, the minor developed a "near morbid fear of men," and acted in a "highly disturbed manner" as a result of the "ongoing struggle between the mother and father." (In re Anne P., supra, 199 Cal. App.3d at pp. 199 & 196.) Furthermore, Anne P.'s affirmance of the juvenile court's jurisdictional order must be understood in the context of the falsely accused father's absence from the jurisdictional hearing and his general uncooperativeness during juvenile court proceedings. (Compare id. at pp. 199-201 (maj. opn. of Stone (P.G.), J.) [father essentially brought jurisdiction and adverse dispositional order on himself] with id. at pp. 201-202 (conc. opn. of Brauer, J.) [sympathizing with falsely accused father whose savings were depleted for having given up the fight after the jurisdictional hearing].)
[20] In that connection it is important that the juvenile courts not allow themselves to be maneuvered into situations where serious child abuse allegations are never formally resolved. In divorce cases in particular, there is a serious danger that abuse allegations will be used as a weapon against a party. At least one commentator claims that by 1993, 66 percent of child abuse reports were unsubstantiated, and in divorce cases the figure of unsubstantiated child abuse reports "may be as high as 80 percent." (See Brott, The Abused System, Orange County Register (Aug. 27, 1995) p. Commentary 1, col. 5.)
[21] The Anne P. court never discussed the possibility of misuse of the juvenile dependency system.
[22] At oral argument, counsel for the social services agency candidly told the court that county counsel typically hate these sorts of cases. We heartily sympathize. When molestation allegations are made in a divorce context, social service agencies obviously find themselves in a bind. Obviously one of the core functions of the juvenile dependency statutes is to protect child from molestation. Social services agencies do not have the option of ignoring such cases, even when they arise out of the suspicious circumstances of a divorce. Pedophiles have no business being around children. But the very gravity of the allegations underscores the necessity of obtaining findings on the molestation allegations as expeditiously as possible, rather than leaving the matter unresolved. And if it turns out that the allegations are unsubstantiated and appear to be the product of an attempt by one parent to get the upper hand in a custody fight, county counsel should not hesitate to seek dismissal of the case. They have more than enough real cases to keep them busy.
[23] Philip apparently employed his trial attorney out of his own pocket. Perhaps because he was being paid by a pocket that was not too deep, that attorney pointed out in closing argument that all dependency jurisdiction had accomplished was to provide a "full employment act" for the attorneys and social workers in the case.
[24] At oral argument, we invited the parties to give us their views on this topic in supplemental briefing, which they subsequently did.
[25] At oral argument, we also inquired as to who was footing the bill for the psychotherapy. As we expected, it was the beleaguered taxpayer. In subsequent supplemental briefing counsel for the mother informed the court that the State Board of Control "has awarded the minor, as a victim of a crime, state assistance for psychotherapy services, under Government Code, section 13960, et seq." The statute to which counsel referred is the Victims of Violent Crime Act, which provides for assistance to victims of certain crimes. (See Illingworth v. State Bd. of Control (1984) 161 Cal. App.3d 274, 275 [207 Cal. Rptr. 471].) While a criminal prosecution is not absolutely required for assistance under the act (see Anne B. v. State Bd. of Control (1984) 165 Cal. App.3d 279, 285-286 [209 Cal. Rptr. 83]), there still must be a crime. Going through a "tense" divorce, however, is not a crime.