Filed 4/3/15  In re Juan M. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re JUAN M., et al., Persons Coming Under the Juvenile Court Law. | B256827 |
| | (Los Angeles County Super. Ct. No. CK74904) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| JUAN M., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Carlos E. Vasquez, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, Dawyn R. Harrison, Tracey F. Dodds, Office of County Counsel for Plaintiff and Respondent.

_____

**INTRODUCTION**

Father Juan M. appeals from the juvenile court's order terminating its jurisdiction and ordering Mother to have sole physical custody of their two children, 12-year-old Juan and nine-year-old Juanita, and Father to have supervised visits with the children conducted by a paid professional monitor at Father's expense. Father argues that the court abused its discretion in making the exit order because it relied on testimony from the children, who Father asserts had "limited ability to form an intelligent preference as to custody or visitation." We affirm as substantial evidence of Father's unresolved anger problems and the children's reasonable fear of Father supports the court's discretion in making this exit order pursuant to Welfare and Institutions Code[1] section 362.4.

**FACTS[2] AND PROCEDURAL BACKGROUND**

The children were adjudicated to be abused and neglected by the juvenile court pursuant to section 300 in October 2012. The court sustained allegations that Father inappropriately physically disciplined Juan by choking him and striking Juan's head with a fist, and threatening to harm Juan with a hammer. The court sustained allegations that Father inappropriately disciplined Juanita by striking her with his hands and a belt. The court also found that Mother had failed to supervise the children. This Court subsequently affirmed the juvenile court's jurisdictional findings in an unpublished opinion.

---

[1]     Subsequent statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2]     Because resolution of this appeal turns upon the existence of substantial evidence supporting the juvenile court's exercise of discretion with respect to the challenged orders, we state the facts in the light most favorable to the court's determinations. (See *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300 (*Bridget A.*); *In re Stephanie M.* (1994) 7 Cal.4th 295, 319.)

Following the jurisdictional finding, Father began receiving weekly therapy and conjoint therapy with the children and attending weekly anger management and parenting classes. The children entered foster care and attended regular visitation with the parents. Father and Mother were in full compliance with the case plan.

Nonetheless, Father's aggression and anger issues continued to manifest throughout this case. On five different occasions, the children had to be placed in new foster homes due to Father's alienation of service providers. Twice in early 2013, Father threatened Juanita's caretaker. During one of these instances, using expletives, Father told Juanita that he was going to " 'get' " Juanita's caregiver. On another occasion, Father made multiple threats with the implication that he would fight Juan's caregiver, stating to Juan, "You wouldn't want to see me and the foster father gets down [sic]." A subsequent caretaker refused to monitor visitation between Father and the children because Father was controlling, "went off" on her, stated that "he can't deal with women," refused to speak to her, and sneakily tried to talk to the children through a window of her home after the visitation had ended. Father also became visibly angry when Juanita later hugged this caregiver in front of him.

At one visitation in October 2012, Father made many negative comments about the caregivers to the children. When a social worker directed Father not to negatively discuss the caregivers with the children, he responded very loudly telling the social work to stop interfering in his time with his children. Father continued to talk in a disparaging tone and manner about the caregivers. During that same visit, Father became very angry at social workers, yelling and making derogatory remarks at them when Juanita's visitation ended early due to transportation issues. Rather than spend the rest of the visit enjoying his time with Juan, he made phone calls to Department of Children and Family Services (DCFS) staff, continued to raise his voice, became increasingly agitated, and voluntarily prematurely ended his visit with Juan.

During a later visit, when Juanita refused to see Father, he again became angry and aggressive toward DCFS staff. In May 2013, Father would not speak to the children throughout their two-hour visit because the children forgot to make a birthday card for their grandfather. In August 2013, Father again made inappropriate comments about the foster parents. The children then defended their foster parents, and Father became upset and refused to speak to the children. When DCFS ended that visit early because Father had given the children the silent treatment for 40 minutes, Father began to shout that the visit was not over. Father also acted aggressively in posture, tone, and demeanor in one of his final meetings with DCFS in 2014, and was required to be escorted out of the building by security.

Throughout the dependency case, Father had monitored visitation with the children, with one exception. In March 2013, DCFS permitted the parents to begin having unmonitored overnight weekend visitation with the children. Father berated the children for selecting to spend their first unmonitored weekend visit with Mother rather than Father. Following their first weekend visit with Father, Juanita reported to DCFS that the visit did not go well. Juanita stated that Father made them do things that she did not think were fun. Juanita was forced to share a bed with Juan and Father despite there being a second available bed and pull-out couch. Father also fed the children stale cereal for breakfast. Juanita spent most of her time with Father feeling hungry as he did not feed them often. When she told Father that she was hungry, Father acknowledged that the children were hungry but did not provide them food. Father required the children to take baths in a dirty tub each day they were with him. Throughout the weekend, Father persistently made fun of Juan. For example, Juanita reported that Father became angry at Juan for closing his eyes while they were sitting outside in public, telling Juan that it made Father look bad. Father also picked at Juan's hair roughly and caused him to cry in pain. In addition, Father cursed at the children, and told Juan that " 'you're lucky you are in foster care cause I would tear your [expletive] up.' " Following this unmonitored weekend visit, Father resumed monitored visitation with the children.

In general, DCFS observed that Father's visits were not healthy for the children's well being and were not strengthening their relationship with him. A social worker observed that the children were being emotionally and psychologically harmed by the visits. Juan, in particular, repeatedly stated that he did not want to continue visitation with Father. In August 2013, both children asserted that they did not want to be returned to Father's custody because of his negative behaviors. Both children expressly wanted their visits with Father to remain monitored. Juanita told DCFS: " '[Father] gets mad sometimes and yells at the social worker. I don't like when he gets mad. It's scary. So I don't want to go the next time.' " When asked if she was interested in unmonitored visitation with Father, Juanita stated: " 'Oh no. We're not ready for that yet.' " Juanita indicated that she would not be ready for unmonitored visitation for a very long time. In addition, Juan told DCFS that he only attended visitation with Father because Juanita bribed him to go to visits with Father in exchange for Juanita's TV privileges. Juan asserted that he did not like spending time with Father and did not want overnight or unmonitored visitation. Juan explained: " 'I'm uncomfortable with him by myself. He could do anything to me if no one is around. I do not want to be alone with him.' "

At the section 364 review hearing, the children testified in chambers stating more of the same. Juan testified that Father "will yell, and then he will . . . choke me and throw me around the house." Juan stated that Father had done those things to him a long time ago, but he still felt afraid of Father. Juan explained that Father had verbally threatened him three weeks ago, and that Father had recently physically threatened him, by motioning like Father was going to "sock" him. Asserting that he did not want to have unmonitored visitation, Juan reiterated that "anything can happen" without the monitor there.

Juanita also testified that she did not want unmonitored visitation because, "you never know what [Father] could do." Juanita explained that seeing harm come to her brother whom she loves dearly was very upsetting to her. She stated: "when I see [Father] hurt my brother, it is just sad to watch." Juanita recounted one incident that occurred a long time ago where Father "got a hammer and put it up to [Juan's] face, and choked [Juan] just because ... [Juan] wasn't doing his hair right." Juanita said that at a recent visit,

5

Father moved toward Juan and motioned like he was going to hit Juan, and on another recent occasion, Father verbally threatened Juan. Juanita mentioned that although Father had not recently tried to hurt her, he did so about two years ago, referencing the events that led the court to sustain the section 300 petition. She stated that without a monitor at visits, she was concerned that Father would "whoop" her if she said something improper to her brother.

Although the children did not reunite with Father, they reunited with Mother and resumed living with her. On May 30, 2014, the court determined that there was no current risk to the children, and terminated jurisdiction. The court awarded joint legal custody to the parents, and sole physical custody to Mother. The court explained that providing sole physical custody to Mother was appropriate because "[t]he children did express some fear about Father's behavior. Both children testified to a recent incident this year where the father acted as if he might take a swing [at] or punch Juan, Jr." The court ordered that Father have monitored visitation twice per week, and that Father was to pay for the professional monitor.

## DISCUSSION

Father asserts that the court abused its discretion in making an exit order pursuant to section 362.4 that granted Mother sole physical custody and limited Father to supervised visits with professional monitors to be paid by Father. We review the juvenile court's exit order for an abuse of discretion; we will only reverse if the court made an arbitrary, capricious, or patently absurd decision. (*Bridget A., supra,* 148 Cal.App.4th at p. 300.) The juvenile court issues the exit order based on the best interests of the child. (*In re John W.* (1996) 41 Cal.App.4th 961, 974; *In re Chantal S.* (1996) 13 Cal.4th 196, 206.)

Here, there is substantial evidence that Father's anger and aggression issues remained unresolved and that without supervision, he would repeat the abusive behavior underlying the court's basis for jurisdiction in this case. Throughout DCFS's involvement in the case, Father threatened the children's caregivers, acted aggressively toward DCFS staff, and spoke in a demeaning manner toward and about those involved in helping the children and the family. Not only did Father jeopardize the children's stability by forcing

6

their frequent removal from foster homes, but Father emotionally and psychologically harmed them through his poor behavior. He repeatedly required intervention from DCFS social workers regarding his temperament and speech toward the children during visits. The children relayed how Father's behavior upset them to DCFS and how they often did not want to visit with him.

Moreover, Father's behavior indicated that he was unlikely to change his abusive ways. Father's history of physical abuse toward the children was established at the section 300 jurisdiction hearing. Thereafter, Father continued to threaten the children with abuse despite the counseling Father was receiving. Father even commented to Juan that Juan was lucky to have the protection of his foster home because Father would otherwise hurt Juan. Both children testified that Father recently threatened Juan on two occasions. The children's testimony makes it evident that Father's physical abuse was only prevented by DCFS's supervision of Father's time with the children. Without a professional monitor to supervise Father's future visitation, the children would likely be at risk of harm.

Father asserts that the children's testimony should not have been given credence as the children's "testimony suggested limited ability to form an intelligent preference as to custody or visitation." Based on our review of the record, the children appeared competent to testify regarding their relationship and experience with Father. Nine-year-old Juanita and 12-year-old Juan recognized Father's abusive and aggressive behavior not only toward them but also toward DCFS workers and their caregivers. Both children disliked his poor behavior and said they were fearful of him as a result of his threats. This fear evidences the children's legitimate reason to want to limit their interaction with Father to supervised visitation. Furthermore, the children's fear was corroborated by DCFS's reports from caregivers, providers, and their own staff regarding Father's hostile and aggressive tendencies.

To the extent Father suggests that the children's wishes were the sole factor considered by the court making the exit order, we disagree. It appears that the court took into account reports from the children and DCFS regarding Father's abusive behavior in addition to the children's wishes. The juvenile court's central focus was, appropriately, the best interests of the children. In the interest of their safety, due in part to Father's recent threats toward the children, the court ordered visitation to be monitored.

In *In re Chantal S., supra,* 13 Cal.4th at p. 202, the juvenile court similarly ordered pursuant to section 362.4, that the father have monitored visitation with his child at a therapist's office and additionally required that the father attend counseling as a condition of his visitation. The Supreme Court affirmed the juvenile court's exit order, stating that "there are situations in which a juvenile court may reasonably determine that continued supervision of the minor as a dependent child is not necessary for the child's protection, and at the same time conclude that conditions on visitation are necessary to minimize, if not eliminate, the danger that visits might subject the minor to the same risk of physical abuse or emotional harm that previously led to the dependency adjudication." (*In re Chantal S.,* at p. 204.)

The case at bar presents such circumstances that require supervised visitation in order to minimize risk of harm to Juan and Juanita. As the court's order is supported by substantial evidence that the supervised visitation is in the children's best interest, we conclude that the juvenile court did not abuse its discretion in ordering Mother to have sole physical custody and Father to have monitored visitation at his expense. We thus affirm.

8

## DISPOSITION

The exit order terminating the juvenile court's jurisdiction, providing Mother sole physical custody, and requiring Father to have monitored visitation at his expense is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, J.

We concur:


EDMON, P. J.


ALDRICH, J.

9