Filed 7/14/15  In re Jake G. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JAKE G., a Person Coming Under the Juvenile Court Law. | B259260 (Los Angeles County Super. Ct. No. DK06597) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MIGUEL G., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Robert S. Draper, Judge.  Affirmed.

Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica Paulson-Duffey, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

Appellant Miguel G. (father) challenges the juvenile court's jurisdictional and dispositional orders regarding his son Jake G. (Jake) (born Aug. 2012). Specifically, father contends that the juvenile court lacked jurisdiction, the petition's allegations were facially deficient, the evidence was insufficient to support the court's jurisdictional findings, and the court erred in ordering Jake's removal from father and granting sole legal and physical custody to Jake's mother. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Events Leading to Father's Arrest

On March 30, 2014, police met with father's mother, who is Jake's paternal grandmother. She was wearing a shirt that appeared to be stretched out and had blood stains on it. She reported that earlier in the afternoon, she had been sleeping in her home when she heard the door open. Father entered the home and immediately asked if her other son was home. Father then proceeded to change his clothes and wash his hands. He told the paternal grandmother, "This is the time!" (Emphasis omitted.) Father climbed onto her bed and faced the paternal grandmother while on his knees, causing her to fear that he was going to rape her, because he had attempted to rape her back in August 2013. The paternal grandmother tried to call the police, but father threw the phone across the room. She tried to scream, but father put his hand over her mouth. He then pulled down her sweatpants and threw them aside. She was able to remove father's hand from her mouth and told him she was "going to [wet] herself," in an attempt to escape. Father let her go, and removed all his clothing as she ran towards the bathroom. He pulled down her underwear, and she kicked it the rest of the way off in order to run. Father then pulled her hair, threw her on the couch, kneeled on the couch next to her, and tried to pry her legs open. The struggle caused her to fall off the couch. Father then straddled her, held one hand over her mouth, and placed his other hand on her "outer vagina." While she struggled, father penetrated her vagina with his finger two to three times, and stated, "This is what my father needed to do!" (Emphasis omitted.) Father lifted her shirt and placed his lips on her bare breast while holding a hand over her mouth to muffle her screaming.

2

The paternal grandmother bit father's hand, and father punched her in the eye. She continuously stated, "No! No! No!" (Emphasis omitted.) Father got off the paternal grandmother. When she tried to leave, he pulled her by the hair and threw her to the ground. Father then left. She hid in the bathroom until she knew father was gone, then called her sister who picked her up.

The paternal grandmother told the police that between the earlier August 2013 incident and the current incident, father had touched her inappropriately approximately seven times. She never contacted the police because she did not want father to go to jail. She denied that father suffered mental illness. She stated that while father drinks alcohol and smokes marijuana, she did not smell either one during the attack. Police observed that the paternal grandmother had a contusion on her right eye, multiple contusions on her face, scratches on her lips and chins, and lacerations on her left knee and elbow. The police took her to a rape treatment center.

When the police went to the paternal grandmother's home, father was watching television with Jake, who had not been home when the attack occurred. Police arrested father and took Jake to the police station, where he was released to his mother, Karina R. (mother). Mother is not a party to this appeal.

**Detention Report**

On April 1, 2014, a social worker with the Los Angeles County Department of Children and Family Services (DCFS) visited mother and Jake at mother's home. Mother reported that she and father were no longer in a relationship due to his alcohol use and because she did not like the way he acted when drinking. Father usually picked up Jake in the evening and dropped him off the following morning. Mother denied ever seeing father under the influence while picking up or returning Jake. She denied domestic violence with father and did not suspect him of any child abuse. Mother was unaware of the details leading to father's arrest. The social worker informed mother that father had been arrested for sexually assaulting the paternal grandmother, and instructed mother to obtain a custody order from the family law court as soon as possible. Mother stated she would attempt to go to court that week, but needed to check her work schedule. The

3

social worker noted that Jake appeared bonded to mother and did not have any bruises or marks.

The social worker met mother and Jake again on May 4, 2014. Mother had taken Jake to visit father in jail because Jake was crying for father. The paternal grandmother had told mother what father did. Mother stated that she wanted nothing to do with father. She thought he would be incarcerated for a long time and then be deported to Mexico. Mother had not filed for a custody order because she had been working.

The social worker spoke with several of mother's relatives, none of whom reported any concerns regarding either parent's care of Jake.

On June 10, June 25, and July 2, 2014, mother reported that she still had not taken steps to obtain a custody order due to her work schedule. On July 3, 2014, the social worker met with mother to assist mother in filling out the custody forms. On July 14, 2014, mother told the social worker that it would cost approximately $500 to process the custody order and asked for assistance to obtain a fee waiver. Although mother and the social worker were supposed to meet in two days, mother did not appear at the social worker's office until July 22, 2014, at which time the social worker assisted mother with the waiver forms. On July 23, 2014, mother reported that she went to family court and was told the paperwork was incorrectly filled out. The social worker responded that the forms were correct. The social worker also stated that she was not mad at mother but wanted to avoid going to juvenile court, and that DCFS was concerned that no custody order was in place if father was released from jail.

**The Petition and Detention Hearing**

On July 29, 2014, DCFS filed a petition on behalf of Jake under Welfare and Institutions Code section 300, subdivisions (a) and (b).[1] In paragraphs a-1 and b-1, the petition alleged that father had violently sexually assaulted the paternal grandmother, detailed her injuries, and alleged that his violent conduct placed Jake at risk of harm. In paragraph b-2, the petition alleged that father has a history of substance abuse and is a

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

current abuser of marijuana and alcohol, that on prior occasions father was under the influence while Jake was in his care, and that his substance abuse placed Jake at risk of harm. There were no allegations against mother.

Father was present in custody at the detention hearing. The juvenile court found father to be Jake's presumed father, and ordered that Jake remain placed with mother.

**The Jurisdiction and Disposition Report**

On August 26, 2014, DCFS reported that father was interviewed in custody and admitted smoking marijuana and drinking alcohol, but denied doing so in front of his son. Father began experimenting with drugs at the age of 12, with marijuana being his drug of choice. Father began using methamphetamine in 2011, but stopped when he was arrested. Father reported being sexually abused by a neighbor at the age of four or five, but did not disclose the incident to anyone. He stated that he experienced symptoms of mental illness, including auditory hallucinations, panic attacks and anxiety, but denied seeking treatment. Father refused to discuss the allegations in the petition.

Mother reported having concerns about her and Jake's safety because of what father did to his own mother and because of his drug use. Mother stated that on one occasion father was drunk when he came to pick up Jake at her parents' home. Her parents told him to leave without Jake, and he did so without incident. Mother was aware that father smoked marijuana "on and off" for the past seven years, and stated that Jake was always with her when father got high. Mother denied knowing father used any other drugs. She ended her relationship with father because of his "excessive" alcohol use.

**Jurisdiction and Disposition Hearing**

Father appeared in custody at the contested jurisdiction and disposition hearing held on October 1, 2014. His attorney informed the juvenile court that father had accepted a plea of four years in the criminal proceeding. After argument by counsel, the juvenile court sustained the petition, finding that father's conduct against his mother was "so aberrational and so violent and that there are indications that it was caused, in part at least, by the marijuana usage," that father created a risk of harm to Jake. The court declared Jake a dependent of the court, ordered that he remain placed with mother, and

5

terminated jurisdiction pending receipt of a family law order giving mother sole legal and physical custody with monitored visits for father. Father filed this appeal.

<strong>DISCUSSION</strong>

## I. Juvenile Court Jurisdiction

Father contends that the juvenile court lacked "subject matter" jurisdiction. He argues that because he was incarcerated and the possibility existed that he would be deported to Mexico upon his release, "the criminal proceedings had disposed of any speculative risk to Jake." He also argues that "any speculative risk to Jake raising concern for [DCFS] could be addressed in family court" and that the section 300 petition was only filed in juvenile court because the social worker had become "impatient" with mother's failure to obtain a family court custody order.

Father is correct that dependency proceedings are civil in nature and are designed to protect the child, not to punish the parent. (*In re Joshua G*. (2005) 129 Cal.App.4th 189, 202; *In re Malinda S*. (1990) 51 Cal.3d 368, 384.) But the record does not indicate that the juvenile court assumed jurisdiction over Jake simply to punish father for his criminal acts or mother for her delay in obtaining a family court order. DCFS was rightly concerned that there was no custody order in place in the event father might be released from custody. While mother could have obtained a family court custody order, the fact is that she did not. Over a period of four months, even with the social worker's assistance, mother failed to obtain any order from the family court. Neither DCFS nor the juvenile court was required to sit back and take no action to protect Jake.

## II. Petition's Allegations

Father next contends that the section 300 petition filed on Jake's behalf was facially inadequate. He argues that the petition failed to plead facts showing "a sufficient nexus between the violent altercation and a purported substantial risk of harm" to Jake.

A dependency petition must contain a "concise statement of facts, separately stated, to support the conclusion that the child upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted." (§ 332, subd. (f).) "[T]he role of the petition

6

is to provide 'meaningful notice' that must 'adequately communicate' social worker concerns to the parent  [Citation.]" (*In re Jessica C*. (2001) 93 Cal.App.4th 1027, 1037.)

DCFS argues that father has forfeited his claim that the petition's allegations were facially insufficient because he failed to raise the issue below and instead litigated the merits.  We agree with DCFS.  In *In re Christopher C*. (2010) 182 Cal.App.4th 73, 83, the court noted that the majority of courts have followed the forfeiture rule and that only one case, *In re Alysha S*. (1996) 51 Cal.App.4th 393, 397, had gone the other way without much analysis.  The *Christopher C*. court stated:  "Allowing parties to challenge the facial sufficiency of a petition for the first time on appeal conflicts with the emphasis on expeditious processing of these cases so that children can achieve permanence and stability without unnecessary delay if reunification efforts fail.  [Citation.]  Enforcing the forfeiture rule requires parties to raise such issues in the juvenile court where they can be promptly remedied without undue prejudice to the interests of any of the parties involved.  [Citations.]" (*In re Christopher C., supra,* at p. 83; see also *In re Jessica C.*, *supra*, 93 Cal.App.4th at p. 1037 ["If the parent believes that the allegations, as drafted, do not support a finding that the child is 'within' one of the descriptions of section 300, the parent has the right to bring a motion 'akin to a demurrer.'  [Citation.]"].)

### III.  Sufficiency of Evidence for Jurisdiction

Father contends there was insufficient evidence to sustain the juvenile court's jurisdictional findings.  He argues the evidence was insufficient to establish a nexus between his violent conduct and substance abuse and a risk of harm to Jake.

In reviewing a challenge to the sufficiency of the evidence, we determine whether the record as a whole contains any substantial evidence to support the court's conclusion. (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1393–1394.)  In doing so, "we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if other evidence supports a contrary finding." (*In re James R*. (2009) 176 Cal.App.4th 129, 135.)  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient

facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

A child comes within the jurisdiction of the juvenile court under subdivision (a) of section 300 if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm."

A child comes within the jurisdiction of the juvenile court under subdivision (b)(1) of section 300 if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child."

"Juvenile dependency proceedings are intended to protect children who are currently being abused or neglected, 'and to ensure the safety, protection, and physical and emotional well-being of *children who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.] The focus of section 300 is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) Additionally, a parent's past conduct is a good predictor of future behavior. Thus, the court "'must consider all the circumstances affecting the child, wherever they occur.'" (*Ibid.*)

Father correctly points out that Jake was not present during father's violent sexual attack upon the paternal grandmother. But this does not preclude a finding that father's conduct places Jake at risk of harm. (See *In re T.V., supra*, 217 Cal.App.4th at p. 134 [jurisdiction proper where minor not present during parents' episode of domestic violence].) Father's egregious and shocking behavior toward his own mother, which was ongoing, wholly betrayed the fundamental relationship between generations. Father also

8

self-reported symptoms of mental illness, including auditory hallucinations. The potential for physical or sexual abuse of Jake by father would be so devastating that the juvenile court rightly intervened to protect Jake from that harm. Thus, the juvenile court correctly found that father's sexual conduct against his own mother was "so aberrational and so violent" that there was "plenty of nexus to create a showing that there is a risk to the child."

Father also admitted to a lengthy history of substance use, dating back to when he was 12 years old, including marijuana, alcohol, and methamphetamine. Both mother and the paternal grandmother confirmed father's use of illegal substances. Indeed, mother reported that father's excessive drinking and the way he acted while under the influence were the reasons she terminated her relationship with him. Although father and mother denied that father was ever under the influence of drugs or alcohol when caring for Jake, the evidence shows that on one occasion father tried to pick up Jake while father was drunk and mother's parents sent him away. Clearly, father's ongoing alcohol use clouded his parental judgment and placed Jake at risk of harm.

## IV. Removal and Exit Orders

Finally, father contends that the evidence was insufficient to support the juvenile court's dispositional order removing Jake from his custody and that the court abused its discretion in terminating jurisdiction with an exit order granting mother sole legal and physical custody of Jake.

### A. Removal Order

Section 361, subdivision (c)(1), provides that the juvenile court may remove physical custody of the child from the parent where it finds by clear and convincing evidence that there is substantial danger to the physical health, safety, protection, or emotional well-being of the child or would be if the child were returned home, and there were no reasonable means to protect the child without removal from the parent's physical custody.

At the dispositional stage of a dependency proceeding, the juvenile court is required to consider all admissible evidence on the question of the proper disposition for

9

the child, and the court is not limited to the allegations of the sustained petition. (§ 358, subds. (a) & (b); *In re Rodger H*. (1991) 228 Cal.App.3d 1174, 1183.) In fashioning dispositional orders, "[t]he trial court has broad discretion to make virtually any order deemed necessary for the well-being of the child . . . ." (*In re Sergio C*. (1999) 70 Cal.App.4th 957, 960; *In re Christopher H*. (1996) 50 Cal.App.4th 1001, 1006–1008.)

A dispositional order removing a dependent child from parental custody is reviewed for substantial evidence. (*In re Hailey T*. (2012) 212 Cal.App.4th 139, 146.)

Father argues there was insufficient evidence that he "lacked adequate parenting abilities, had abdicated his right to custody, or was incapable of making custody arrangements with mother without a court order." The evidence in the record, however, supports the juvenile court's removal order. The evidence showed that father had a propensity for violence, had acted in a violent manner, had acted in a sexually aberrant way against the paternal grandmother on multiple occasions, had issues with substance abuse, and had symptoms of mental illness, including auditory hallucinations. Indeed, mother had informed DCFS that she was fearful for her own and her son's safety due to father's conduct. This evidence showed that father was not capable of exercising custody over Jake in a safe manner. Thus, the order removing Jake from father's custody was proper.

### B. *Exit Order*

Section 362.4 authorizes the juvenile court, when terminating jurisdiction over a child under the age of 18, to make custody and visitation orders that will be transferred to a family court and remain in effect until changed by the superior court. A custody and visitation order made under section 362.4 is commonly referred to as an "exit order." (See *In re John W*. (1996) 41 Cal.App.4th 961, 970.) "Although both the family court and the juvenile court focus on the best interests of the child, the juvenile court has a special responsibility to the child as *parens patriae* and must look at the totality of the child's circumstances." (*In re Roger S*. (1992) 4 Cal.App.4th 25, 30–31.) The "decision to terminate dependency jurisdiction and to issue a custody (or 'exit') order pursuant to section 362.4" is reviewed "for abuse of discretion," and will not be disturbed "unless the

10

court ""'exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.  [Citations.]"''" (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)  Even where, as here, a juvenile court determines that continued court supervision of a child is unnecessary, it still may place conditions on future parental visits.  (*In re Chantal S*. (1996) 13 Cal.4th 196, 204.)

For the reasons discussed above, the assumption of jurisdiction by the juvenile court and Jake's removal from father's custody was appropriate.  However, there was no need for ongoing juvenile court supervision of Jake or the provision of services to the family.  Mother was nonoffending in the petition, father was expected to be incarcerated for several years, and Jake did not demonstrate any need for services.  Thus, the order terminating juvenile court jurisdiction was proper.

Moreover, granting mother sole legal and physical custody of Jake was in his best interests.  While father is correct that there is no "go to prison, lose your child" rule, he ignores the many factors besides his incarceration that demonstrate the juvenile court's custody and visitation order was in Jake's best interests.

In addition to father's violent, aberrant sexual behavior, substance abuse, and symptoms of mental illness including auditory hallucinations, mother reported being fearful for her own and her child's safety.  Mother's fear of father undermines his argument that he and mother could work together on making legal decisions about Jake. Under the circumstances here, it is difficult to understand how mother and father would be able to jointly agree regarding the important medical, educational and other decisions that would need to be made for Jake.  Because the juvenile court acted in Jake's best interests in granting mother sole legal and physical custody of Jake, there was no abuse of discretion.

11

**DISPOSITION**

The juvenile court's orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
    ASHMANN-GERST


We concur:


_____, J.
  CHAVEZ


_____, J.
  HOFFSTADT