Filed 4/28/16  In re L.L. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.L. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E064440 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J258765 & J258766 & J258767) |
| v. | OPINION |
| C.L., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Respondent.

Jean-Rene Basle, County Counsel, Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

1

C.L. (mother) is the mother of L.L., O.L., and E.L. (the children), ages 11, 13, and 15, respectively. Mother appeals from the juvenile court's orders requiring visits to be supervised in a therapeutic setting. For the reasons set forth below, we shall affirm the visitation orders.

## FACTUAL AND PROCEDURAL HISTORY

On February 6, 2015, L.L., O.L., and E.L., then ages 10, 12, and 14, respectively, came to the attention of San Bernardino County Children and Family Services (CFS); it received a referral indicating that mother was arrested for a hit-and-run incident, and may be schizophrenic. Mother believed that others were trying to harm her children and accused her neighbors and husband of child molestation.

The social worker interviewed mother over the phone several times while she was incarcerated. The detention report indicated that mother and the social worker discussed custody arrangement for the children, who were situated with relatives. The maternal grandmother (MGM) was protective and there were no "hits" on her records. The children, were, therefore placed with her and the maternal uncle.

On February 9, 2015, the social worker visited mother at jail. Mother stated that she had never seen or spoken to the social worker "in her life," although the social worker had met and spoken with mother several times prior. During the interview, mother denied engaging in domestic violence, but admitted that her husband hit her before they married. She also revealed an injury on her arm and said "she could not speak about it." Mother denied abusing substances and denied having mental health issues. Mother admitted that she was placed on a 72-hour mental health hold but did not

know why. Mother evaded questions the social worker asked. Mother also stated that she locked her doors and windows, but they were being unlocked from the inside; her neighbors were out to get her and her children; she was arrested due to a conspiracy; there were alleged sexual predators in her neighborhood; and she may have been drugged with gas piped through the jail air ducts. She also thought her children were dead. Furthermore, she faced disciplinary action at the jail for giving another inmate the "middle finger."

The social worker spoke with relatives. The maternal uncle stated that the children often spent time with MGM and him since mother often left because she feared people were trying to get her. Moreover, mother had a history of abusing ecstasy, methamphetamine, and marijuana. She was once placed on a 72-hour mental hold after fighting with law enforcement. Mother also fought with neighbors, thinking they were "running a gang, or a child pornography or molestation ring." CFS found those claims were not corroborated after interviewing the children.

The social worker interviewed each child. They each expressed concern about mother and confirmed domestic abuse between mother and J.D.[1] (father). Mother would throw and break things. The parents often screamed at each other. Father once bit mother out of anger and mother knocked father's tooth out. O.L. described mother being suspicious and paranoid about neighbors, and acting "crazy" and "schizophrenic." Mother also smoked marijuana and was at times loopy.

---

[1] J.D. is the presumed father of E.L. and L.L. D.S. is the alleged father of O.M. The fathers are not parties to this appeal.

A sheriff's report summarized the incident giving rise to mother's incarceration for vehicle assault. Witnesses remarked that mother frequently accused neighbors of molesting her children. On February 6, 2015, mother yelled at two neighbors and tried to run them over with her vehicle. The neighbors had to jump out of the roadway; mother came to within one foot of hitting one victim. Mother fled the scene. Later, mother stood in front of her vehicle repeatedly stating that she was being chased. Mother also contended that neighbors were holding her husband against his will. One of the witnesses reported that mother took a neighbor's screen door the night before.

The deputy summoned to the February 6 incident reported that mother appeared to be under the influence. The deputy arrested mother for assault with a deadly weapon and drug possession. Mother had previously been arrested for being under the influence, contempt of court, criminal trespass, and ramming her vehicle into another vehicle.

On February 10, 2015, CFS detained the children out of parental custody. On February 13, the social worker filed Welfare and Institutions Code[2] section 300 petitions on behalf of the children. As to mother, the petitions alleged failure to protect under section 300, subdivision (b).

On February 17, 2015, at the detention hearing, mother was in custody but present in court with her counsel. The court found a prima facie case under section 300, detained the children with MGM, ordered supervised visits to occur once weekly for two hours

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

upon mother's release from custody, gave CFS authority to liberalize the frequency and durations of visits, and set the jurisdiction/disposition hearing for March 10, 2015.

The jurisdiction/disposition report recommended that the court sustain the petitions, order family reunification services, and maintain placement with MGM. The two boys, E.L. and O.L., were described as "timid and guarded," but the youngest sibling, L.L., a girl, spoke freely. All three siblings revealed that mother drank beer and smoked marijuana or another substance.

Mother was released from jail in February 2015. The social worker interviewed mother at home and noted that mother often spoke about irrelevant topics. Upon direct inquiry, mother denied abusing substances, and stated she was "straight" since she spent two weeks in jail; she drank just one beer daily. She confirmed that she faced charges in 1999 stemming from her being under the influence of speed.

Law enforcement documented domestic violence between the parents in reports prepared in 2003, 2004 and 2006. In 2004, father reportedly argued with MGM and kicked her while she held one of the children. In 2006, the parents argued; father then grabbed mother by the throat and threatened to kill her. On February 2, 2015, mother reportedly broke a guitar, and father bit her and broke her nose. That day, mother was placed on a 5150 hold.

The children described mother's erratic behavior. For example, mother telephoned law enforcement to report child molestation by neighbors, and other crimes and incidents not reflecting reality. Years ago, while under the influence of speed, mother called 911 to report that someone was trying to kill her. In 2010, she rammed her

vehicle into another vehicle in anger. Concerning her February 2015 arrest, mother was convicted of felony assault with a deadly weapon (her vehicle) and placed on formal probation, set to expire on February 18, 2018.

MGM stated that mother's mental issues had gotten worse lately, and her behavior had become more erratic. O.L. felt it was like his mother was schizophrenic because she thought things were happening when they were not. These episodes had been occurring for about one year. L.L. noted that mother called the police thinking people were coming to get her. That occurred in the past couple of months. Father reportedly lived in and out of the home, and last visited on February 2, 2015, when mother was placed on a 5150 hold. Mother's child welfare history included referrals alleging neglect in 2007, 2009, 2014, and 2015, which were deemed inconclusive or unfounded.

On March 10, 2015, mother was present when the court held the jurisdiction/disposition hearing. She disagreed as to certain allegations or particular wordings, but offered no affirmative or rebuttal evidence. After making slight amendments, the court sustained the section 300, subdivision (b) allegations, removed the children from the parents, placed the children with MGM, and ordered family reunification services for mother, with supervised visits to occur at least once weekly for two hours. The court also gave CFS authority to liberalize the time, frequency, and supervision for visits; set the six-month review hearing; and advised mother to attend.

The six-month review hearing report filed on September 1, 2015, stated that mother failed to appear for a criminal court hearing related to an under-the-influence charge from February 2015, which led to a bench warrant being issued for her arrest.

6

Moreover, the social worker called mother several times to facilitate services; mother did not answer the telephone. When mother finally answered, she was distracted and seemed confused. She mumbled and hung up on the social worker. Mother did not answer when the social worker attempted to call her back.

Mother attended outpatient substance abuse treatment, but had trouble grasping her need for services despite producing several positive drug tests reflecting her use of amphetamines, methamphetamines, morphine, opiates, and marijuana. Mother also relied upon MGM to fund her residence and did not maintain a home of her own.

Mother's illicit drug use apparently fostered her disconnect from reality and low functioning. Additionally, mother attended only half of the visits offered to her, i.e., twice monthly instead of weekly. Moreover, the quality of the visits was poor. MGM initially supervised visits at a park, but mother argued with MGM. Thereafter, visits were moved to a visitation center. At the center, a visitation coach noted that mother was inappropriate with the children. She cursed, talked about the case, and asked the coach to lie to CFS. The children laughed at and made fun of mother, and refused mother's attempts to interact with them and show affection. The social worker deemed mother's progress in services minimal, and recommended continued family reunification services.

In a second report entitled "Additional Information to the Court" filed on September 9, 2015, the social worker advised that an August 2015 psychological evaluation revealed that mother displayed "psychotic type behaviors . . . was extremely disorganized. . . and was jumping from topic to topic." (Italics omitted.) The diagnosis seemed to explain the problems with visits. Mother often made unannounced visits to

7

MGM's home, and twice traveled to E.L.'s bus stop. On a scale of one to 10, the children described the quality of visits with mother as five or six, and felt the visits were boring and unproductive. The children disclosed that mother attempted to steal money and a guitar at church visits. All the children reported having varying levels of "embarrassment" because of mother's behavior at visits. The social worker opined that it was more appropriate for visits to occur in a therapeutic setting, given mother's behavior at visits and unresponsiveness to "multiple redirects" from the caregiver, social worker, and visitation coach. The social worker recommended therapeutic visits, and no contact between mother and the children outside of visits.

Mother failed to appear in court for the jurisdiction/disposition review hearing. Mother's counsel objected to the proposed visitation order, but presented no affirmative evidence. The court ordered therapeutic visits, indicating such visits would constitute reasonable services and be very helpful. The court also authorized CFS to arrange supervised visits, increase the frequency and duration of visits, and to seek court approval through a packet to facilitate overnight/weekend visits and return to mother. The court continued family reunification services for mother and set the 12-month review hearing for March 10, 2016.

## DISCUSSION

Mother contends that the juvenile court erred in restricting mother's visitation to a therapeutic setting.

8

Placement and visitation orders are the prerogative of the juvenile court, which must always consider the best interest of the child when making such orders. (*In re John W.* (1996) 41 Cal.App.4th 961, 973-974.) The court has broad discretion in fashioning visitation orders and its determination will not be disturbed on review absent a clear abuse of discretion. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) Under the abuse of discretion standard of review, an appellate court should not disturb an order unless the trial court made an arbitrary, capricious or patently absurd determination. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

During reunification efforts, visitation generally must be as frequent as possible, consistent with the well-being of the child. (§ 362.1, subd. (a)(1)(A).) At the same time, visitation orders must provide for "flexibility in response to the changing needs of the child and to dynamic family circumstances." (*In re S.H.* (2003) 111 Cal.App.4th 310, 317.) "In addition, the parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense." (*Ibid.*) In fashioning a visitation order, the juvenile court should balance the interests of the parent and the child, and impose any conditions on visitation consistent with the child's best interests under the particular circumstances of the case. (*In re Shawna M.* (1993) 19 Cal.App.4th 1686, 1690.) Hence, the court should not sit idly by and permit ongoing visits that cause a child to suffer emotional harm. (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1357.) Instead, the visits must be consistent with the well-being of the child, and no visitation order shall jeopardize the child's safety. (§ 362.1, subd. (a)(1)(A) & (B).)

In this case, mother contends that the trial court abused its discretion when it modified mother's visits with the children from weekly supervised visits to supervised visits in therapy. We disagree.

As summarized above, the family came to the attention of CFS because mother was arrested for attempting to run over neighbors with her vehicle because she believed that they were gang members, molesting her children, and imprisoning her husband. O.L. stated that mother acted "crazy" and "schizophrenic." Mother was impulsive and violent, and said strange things. When she was incarcerated, she thought a conspiracy led to her arrest and believed she may have been drugged through gas piped through the jailhouse vents. Mother also believed her children were dead.

MGM observed that mother's mental health issues were increasing. On February 2, 2015, days before her vehicle assault, she was placed on a section 5150 hold after fighting with father. Her substance abuse apparently exacerbated her mental health issues and erratic conduct, but mother refused to acknowledge her current substance abuse problems.

On February 5, 2015, mother was released from jail. Just one month later, the juvenile court took jurisdiction over the children, ordered family reunification services and weekly supervised visits for mother. Thereafter, mother's erratic conduct continued, and threatened the stability of the placement and the children. For example, mother made several unannounced visits to the caregiver's home and repeatedly traveled to E.L.'s school bus stop, violating visitation rules. Hence, by the September 2015 review hearing,

10

the social worker had no choice but to recommend that the court order visits to occur in a therapeutic setting.

At the hearing, mother's counsel objected to the proposed change in the visitation order, but did not present affirmative evidence on the issue. The evidence, however, did show that mother only attended approximately 50 percent of the authorized visits, attending twice monthly as opposed to weekly, as ordered. Moreover, although mother attended outpatient substance abuse treatment, she resisted reform. The social worker tried to contact mother; mother did not answer the telephone. When she finally answered, mother mumbled nonsensical words and hung up on the social worker. Mother did not answer the social worker's calls thereafter. Drug tests revealed that mother abused illicit substances during the review period, contributing to mother's erratic conduct. Furthermore, mother was unresponsive to "multiple redirects" by visitation supervisors.

At the six-month review hearing, the children were ages 11, 13, and 14. The children rated the quality of their visits with mother as being a five or six, on a scale of one to 10. The children found the visits "boring," and the supervisors felt the visits were unproductive. The children rejected mother's attempts to interact and demonstrate affection toward them. The social worker opined it would be most the appropriate for visits to occur in a therapeutic setting, given mother's erratic behavior at visits and unresponsiveness to redirects from the supervisors.

11

At the hearing, the court asked, "[I]s the reason for the therapeutic-setting request because—frankly, the mother probably needs to be directed in a appropriate manner on how to visit the children as opposed to when she does visit she is all over the place[?]" When counsel responded, "Yes," the court went on to state, "Is that kind of the reason? That kind of makes sense; it seems like it would be helpful to Mom to learn how to be guided by somebody who is a professional." The court then went on to state, "It almost seems to me that if I don't order [therapeutic visits], then I'm denying a reasonable service to the mother because she needs it. That's my take on it. She needs to be properly instructed on how to visit." After hearing the objection of mother's counsel, the court concluded: "All right. I'm going to—over the mother's objection, I'm going to grant the request by CFS and have visits in a therapeutic setting, and I actually think it would be a reasonable service and very helpful." The court went on to state that CFS would have authority to liberalize visitations as to frequency and duration, and "CFS can liberalize whether or not it is in a therapeutic setting as that is needed."

In light of facts summarized above and the juvenile court's thoughtful decision-making process, we cannot say that the court made an arbitrary, capricious, or patently absurd determination when ordering therapeutic visitations for mother. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) Instead, the court demonstrated flexibility and responded appropriately to the needs of the family and dynamic family circumstances, which was what the court was required to do. We discern no abuse of discretion and affirm the trial court's visitation orders.

**DISPOSITION**

We affirm the juvenile court's visitation orders and affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____
Acting P. J.

We concur:

CODRINGTON_____
J.

SLOUGH_____
J.

13