Filed 9/30/21  In re Lincoln C. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Lincoln C., a Person Coming Under the Juvenile Court Law. | B310802 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19CCJP02886A) |
| Plaintiff and Respondent, | |
| v. | |
| J.C., | |
| Defendant and Appellant. | |

APPEAL from order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Juvenile Court Referee. Affirmed.

Suzanne M. Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

Appellant J.C. (Father) appeals a custody "exit" order, arguing the juvenile court abused its discretion when it ordered monitored visitation for Father.

We disagree, and find the juvenile court did not abuse its discretion in ordering monitored visitation. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Referral, Investigation, Removal*

On March 29, 2019, the Los Angeles Department of Children and Family Services (DCFS) received a referral alleging Father was emotionally abusing his son Lincoln, then a 10-year-old child with autism. The reporting party stated Mother and Father were "undergoing a contentious divorce." Mother had a domestic violence restraining order in place against Father, and Father had a long history of abuse and domestic violence. The reporting party stated Mother said Father was "verbally abusive and threatened [Mother's] life in the child's presence." The reporting party also stated Father "is transient and lives in his RV."

On April 3, 2019, a children's social worker (CSW) interviewed Mother about the allegations. Mother stated her relationship with Father "has been a domestic violence relationship since the beginning.[1]" Per Mother, Father would promise to make things better. "[W]hen things were 'bad,' he would slap her and punch her." Mother was left with marks and bruises, including "blackened eyes." Mother stated that "being choked by [Father] was the most frightening because when she

---

[1] Mother and Father married on May 12, 2005.

would start to lose consciousness, she didn't know if she would live or die." Father has threatened and intimidated her and has threatened to take Lincoln to Ohio with him. It took Mother "over a decade to finally call the police and get a temporary restraining order" and since then, she "has experienced the most peace she's had in many years."

Mother showed the CSW two Ring doorbell camera videos. The first video shows Father attacking Mother at the front door of her home. Father is seen waiting on the porch and upon Mother opening the gate, he appears "to lunge at her and then move away and again force his way into the home." Then a female is heard screaming. The second video shows Father and Lincoln arriving at the home; Lincoln appears upset and attempts to hit Father on his chest. In response, Father pushes the child "against the edge of the porch (cornering him in the area) and ask[s] the child if he wants to be hit." Father repeats this several times, threatening to hit Lincoln at the front door of the home. The child is seen crying in the video and stops attempting to hold Father's hand. Mother also provided the CSW with pictures of her blackened eyes and copies of several back-and-forth emails with Father.

On one occasion, within 48 hours of being denied a permanent restraining order, Mother was outside watering the lawn with Lincoln when she looked up and saw Father standing there. She took her son by the arm and pulled him into the home. She stated "it was unnerving for him to show up within 48 hours of being denied a permanent restraining order." She called the police and showed them the temporary restraining order; however, there was nothing they could do since he was not "on her property." The police advised her to follow-up in court

3

and seek a permanent restraining order. On another occasion, Father showed up in the backyard of her house and knocked on her bedroom window.

The CSW interviewed Lincoln, who was "not easily engaged in conversation." Lincoln did state, however, that he loves his Father and Mother. The CSW observed Lincoln to be "well behaved, and well-nourished."

On April 4, 2019, Mother obtained a temporary restraining order against Father. Father was ordered not to harass, threaten, assault, or disturb the peace of Mother. He was also ordered not to contact Mother, either directly or indirectly, by telephone, mail, email, or other electronic means.

That same day, the CSW interviewed Father. He admitted going to Mother's home without her consent. He acknowledged this is the only relationship where he had engaged in domestic violence but that there has only been three incidents"—an incident in 2004, in 2007, and an incident at Christmas 2018. Father stated Mother has "an alcohol problem" and that alcohol makes her an aggressor. He believed Mother was "the problem." When the CSW asked him about the Ring videos, he stated "the police concluded that no crime was committed." As to the incident where Father appeared at the sidewalk in front of Mother's lawn, he stated he "never violated the restraining order . . . [as he] went to Mother's house two days after the restraining order expired." He stated Mother grabbed the child and yanked him away when all he wanted was to talk to his child; he felt "this was abusive" and was "very upset" about it.

On May 3, 2019, Mother stated Father "continues to send manipulative communications directly to the autistic child Lincoln's phone" which caused him "to cry uncontrollably from

4

May 3rd through May 6th, and he could not be consoled." At this time, Mother had physical custody of Lincoln, as Father had moved to Akron, Ohio and reported he was marrying another woman. Father "continue[d] to announce his intention to move the child . . . from Los Angeles, CA to Akon, OH to live with [Father] and his German fiancé."

On May 3, 2019, the juvenile court issued an order removing Lincoln from Father's custody and releasing him to Mother.

B.    *Petition and Detention*

On May 7, 2019, DCFS filed a petition on behalf of Lincoln, pursuant to Welfare & Institutions Code[2] section 300, subdivisions (a) and (b)(1). The petition alleged Mother and Father have a history of violent altercations. On a prior occasion, Father had struck Mother with his fists, "inflicting marks and bruises to [Mother]." On other occasions, Father choked Mother and she sustained "bruising to [her] eyes." Father's "violent conduct . . . endanger[ed] the child's physical health and safety and place[d] the child at risk of serious physical harm and damage."

That same day, the CSW spoke to Father via telephone. Father explained he intended to remain in Ohio but planned to obtain custody of Lincoln where he can "provide a better life."

At the detention hearing on May 8, 2018, the juvenile court declared Lincoln a dependent of the court and found a prima facie case for detaining the child from Father. The court found a substantial danger to the physical and emotional heath of the

---

[2]    All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

child and no reasonable means by which the child's physical or emotional health could be protected without removing the child from Father's home. The court ordered Lincoln released to Mother's home under DCFS supervision. The court further ordered monitored visitation and monitored telephonic contact for Father, with visits monitored by a DCFS-approved monitor.

C.    *DCFS's Continued Investigations*

During a monitored FaceTime call between Father and child on May 25, 2019, Lincoln appeared "very excited" to speak with Father. They discussed sports. Father told Lincoln he "tried to call/message him several times but he is 'blocked.' " During another monitored Facetime call on June 7, 2019, Father expressed to Lincoln how much he misses and loves him. Father, again, stated to Lincoln that he texted him but remains blocked, to which the CSW reminded Father to "keep the conversation appropriate." Father became upset and stated to the CSW, "[Y]ou do not know anything and you cannot tell me what to do" and hung up. The CSW observed Lincoln appeared sad.

On June 12, 2019, DCFS reported a prior allegation of emotional abuse of Lincoln by Father, made in September 2013. Father and paternal grandmother had yelled at each other for 10 minutes; Father was angry because Lincoln "damaged the remote control by spilling milk on it the day before." Father threatened paternal grandmother with violence. Father had "a history of yelling and using profanity towards Lincoln (i.e. pay attention, eat the fucking food, etc.) when Mother isn't home." Lincoln did not make "any noises during the verbal abuse." At that time Mother had denied Father was emotionally abusive towards Lincoln, and the allegations were determined to be "unfounded."

6

DCFS completed a criminal history search and discovered Father had "several arrests . . . related to domestic violence, however, no criminal convictions." In October 2004, Father punched Mother in the stomach. "It was one hit, really hard and [Mother] went down" and had blood coming from her mouth. She was admitted to UCLA hospital and he went to jail for four days. Mother did not press charges. Mother described to DCFS the additional domestic violence incidents she had experienced in 2005, 2006, and 2007. Paternal grandmother had told Mother "he did the same thing to his ex." Mother spoke with Father's ex, who told Mother that Father was "aggressive." Father's rage "was crazy." Years later, in January 2017, when Mother asked Father to leave, he threatened to kill her, which led her to contact the police and obtain a temporary restraining order.

Father told the CSW he has "never raised [his] hand to that woman; not in front of [his] son or away from him in his 10 years of life." He stated he is "not abusive" and has never struck Mother. He further stated Mother had obtained a previous restraining order against him because she "walked in on [him] cheating on her." He said, "I didn't touch her."

On June 17, 2019, Mother filed a request for a restraining order with the juvenile court, which granted it the same day. Father was ordered not to contact Mother, not to harass, attack, threaten, batter, or harass Mother, and to stay at least 100 yards away from Mother, her home, her workplace, and her vehicle. The juvenile court ordered Lincoln remain released to Mother under DCFS supervision.

On August 22, 2019, DCFS informed the court Father continued to have regular telephonic and FaceTime contacts with Lincoln; the "content of the conversation is always very basic"

and the calls "do not last more than 10 minutes." Lincoln appeared "always very happy and excited to talk to" Father. The CSW observed Father "tear up a few times during the calls" prompting Mother to tell the CSW to instruct Father not to cry while on the phone with his son.

D.    *Jurisdiction and Disposition*

The adjudication hearing took place on October 4, 2019. The juvenile court sustained the section 300 petition as alleged. The court also ordered Lincoln removed from Father who posed a substantial danger to Lincoln's physical heath or emotional well-being. The court ordered placement in Mother's home with monitored visitation for Father, a minimum of six hours a week.

The court-ordered case plan for Father included completion of a 52-week certified domestic violence course and Parents Beyond Conflict or a similar program. Father was also ordered to participate in individual counseling. The court-ordered case plan for Mother included enrollment in a domestic violence support group for victims and individual counseling.

Finally, the court reissued the temporary restraining order and required Mother to serve it on Father, who was not present at the hearing.

E.    *Review Hearings*

On February 28, 2020, the juvenile court found Father had not been served with the restraining order papers, and granted a reissuance of the restraining order until the next hearing set for March 18, 2020.

The March 18, 2020 hearing was continued pursuant to the Administrative Order dated March 17, 2020 on the COVID-19

pandemic. The restraining order was reissued pending the next hearing date.

On March 25, 2020, DCFS provided the court with a status report. Lincoln was observed "doing well at home and at school with his mother addressing any immediate needs related to his autism." Lincoln remained "safe and stable in the care of his mother who has committed herself to providing the daily care he needs given his developmental level." Meanwhile, Father continued to reside in Ohio and maintained "bi-weekly contact with Lincoln via monitored FaceTime correspondence." Father shared with the CSW that he "is not in agreement with the case outcome and feels he is being unfairly treated." He has not participated in any of the court-ordered services to date. He further shared with the CSW that he "is tired 'of it' and 'he is done.'" Father reported he had remarried and moved on with his life. He told the CSW "there is no proof of anything." He reiterated that Mother is "bitter and jealous with [him]." He acknowledged he "continues to maintain a lot of anger and resentment toward her."

On July 30, 2020, Mother withdrew her request for the permanent restraining order because Father had moved out of state and she had not been able to locate his current address.

On January 25, 2021, DCFS submitted another status report to the juvenile court. Mother completed multiple parenting courses and provided certificates of completion. Father remained "not in agreement with why [DCFS] is involved. Father continues to deny any domestic violence with the mother which he feels she has made up to keep Lincoln from him." Father stated he wanted the case to "be over and go away." Father continued to reside in Ohio, but reported that he planned

to return to California this year.  Father had not made any progress toward his case plan.  He maintained bi-weekly monitored FaceTime visits with Lincoln on Wednesdays and Fridays.

At the section 364 review hearing on February 1, 2021, DCFS recommended that the court terminate dependency jurisdiction, award joint legal custody to both parents and sole physical custody to Mother, and order monitored visitation for Father.  Mother requested sole legal and sole physical custody, because Father "continues to deny everything" and "has absolutely not participated in any portions of the case plan."  She also requested monitored visitation by Father.  Father argued that while he "hasn't completed his case plan, it kind of cuts both ways . . . because Mother hasn't completed her case plan either."  He requested unmonitored visitation or that Lincoln be returned to his care because "there's no safety concern for the child."

The court found monitored visits appropriate.  "Father was the perpetrator in this domestic violence relationship, and he never completed the case plan and is in denial about his actions."  Father was allowed six hours of monitored visitation per week with a mutually agreed-upon monitor; while Father is out of state, visits shall be video or telephone.  The court ordered joint legal custody for both parents and communication between them via the Talking Parents app only.  The court found the conditions that justified the initial assumption of jurisdiction under section 300 no longer existed and were not likely to exist if supervision was withdrawn.  The court found continued supervision of the child no longer necessary and terminated jurisdiction.  On February 2, 2021, the custody order was filed and jurisdiction was terminated.

Father timely filed a notice of appeal.

## DISCUSSION

A.   *Standard of Review*

The juvenile court has broad discretion in making custody orders when it terminates jurisdiction in a dependency case, (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 265, fn. 4 (*Nicholas H.*).)  The " 'juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion . . . order[s] in accordance with this discretion.' " (*In re Corrine W.* (2009) 45 Cal.4th 522, 532.)

" 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)  As a reviewing court, we do not substitute our judgment for that of the juvenile court.  (*Id.* at p. 319.)  We do not "weigh the credibility of the witnesses or resolve conflicts in the evidence.  [Citation.]  Rather we must indulge in all reasonable inferences to support the findings of the juvenile court and must review the record in the light most favorable to the juvenile court's orders."  (*In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 839.)  Where substantial evidence supports the trial court's order, there is no abuse of discretion.  (*Ibid.*)

B.   *Applicable Law*

When a juvenile court terminates jurisdiction over a dependent child, it may issue family law orders governing custody or visitation, commonly referred to as "exit orders." (§ 362.4, subd. (a); *In re Kenneth S., Jr.* (2008) 169 Cal.App.4th 1353, 1358.)  These exit orders are transferred to the family court to become part of the relevant family law case file or, if no

11

proceedings are pending in family court, "may be used as the sole basis for opening a file in the superior court of the county in which the parent, who has been given custody, resides." (§ 362.4, subd. (c); *In re John W.* (1996) 41 Cal.App.4th 961, 970, fn. 13 (*John W.*).) " 'When the juvenile court terminates its jurisdiction over a dependent child, section 362.4 authorizes it to make custody and visitation orders that will be transferred to an existing family court file and remain in effect until modified or terminated by the superior court.' " (*In re Chantal S.* (1996) 13 Cal.4th 196, 203 (*Chantal S.*).)

In making custody orders, the court must "make an informed decision concerning the best interests of the child" (*John W.*, *supra*, 41 Cal.App.4th at p. 972.), and its primary concern must be a determination of " 'what would best serve and protect the child's interest.' " (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 652; see also *Nicholas H.*, *supra*, 112 Cal.App.4th at p. 268; *Chantal S.*, *supra*, 13 Cal.4th at p. 206.)

B.    *The Juvenile Court Did Not Abuse Its Discretion in Ordering Monitored Visitation for Father.*

Father contends the juvenile court abused its discretion when it ordered monitored visitation between him and Lincoln. He believes unmonitored visitation is in Lincoln's best interests. He argues no evidence shows he is a violent or abusive parent and the "risk of exposing Lincoln to domestic violence between the parents had been mitigated" as he now resides in Ohio. He asks us to reverse the order for monitored visitation and remand to the family court with directions to permit unmonitored visits.

We disagree with Father.

12

Based on a review of the record, we cannot say the juvenile court acted arbitrarily in ordering Father to have monitored visits with Lincoln. Father's domestic violence incidents with Mother spanned over a decade. At least one domestic violence incident was in Lincoln's presence. Similarly, there was another incident (on the Ring video) where Father threatened to hit Lincoln and cornered him on the porch simply because Lincoln appeared upset and had attempted to hit Father on his chest; the child was then seen crying and letting go of Father's hand. We do not view Father's reaction to be an appropriate response, especially to a child with autism.

Apart from physical incidents, Mother had told the CSW that Father continued to send "manipulative communications directly" to Lincoln, causing him "to cry uncontrollably from May 3rd through May 6th, and he could not be consoled."

Father indicated to DCFS that he intends on returning to California sometime this year. The fact that Father has not completed or enrolled in any of the court-ordered courses and case plan, as well as Father's continued refusal to admit to any domestic violence incidents with Mother, also demonstrates to us that the juvenile court's order for continued monitored visitation was reasonable and appropriate. We cannot find the exit order arbitrary or capricious.

13

**DISPOSITION**

The exit order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, Acting P. J.

We concur:

WILEY, J.

OHTA, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.